UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA


- - - - - - - - - - - - - -


NIX, et al.                         Docket No. 7:17-CV-189-D
                                    Docket No. 7:17-CV-195-D
v.                                  Docket No. 7:17-CV-197-D
                                    Docket No. 7:17-CV-201-D
THE CHEMOURS COMPANY,               Docket No. 7:17-CV-209-D
FC, LLC, et al.                     Docket No. 5:18-CV-73-D

                                    Raleigh, North Carolina
- - - - - - - - - - - - - -         May 25, 2018



**TRANSCRIPT OF STATUS CONFERENCE**
**BEFORE HONORABLE JAMES C. DEVER III, CHIEF DISTRICT JUDGE,**
**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NORTH CAROLINA**


APPEARANCES:

For the Plaintiffs:    Theodore Leopold, Esq.
                       George House, Esq.
                       Stephen Morrissey, Esq.
                       Stephen Bunch, Esq.
                       Stephen Johnston, Esq.

For the Defendants:    Kenneth Reilly, Esq.
                       John Sherk, Esq.
                       Mark Anstoetter, Esq.
                       Stephen Feldman, Esq.
                       Jonathan Sasser, Esq.

Court Reporter:        Harold M. Hagopian, RDR, CRR




Proceedings recorded by mechanical stenography,
Transcript produced by computer-assisted transcription.

1                    **PROCEEDINGS**

2          (The following proceedings were held in open court at

3      the United States Courthouse, 310 New Bern Avenue, Raleigh,

4      North Carolina, before the Honorable James C. Dever III,

5      Chief District Judge for the Eastern District of North

6      Carolina, on May 25, 2018, at 10:59 a.m.)

7                          *       *       *

8                THE COURT:  Good morning, and welcome to the

9      United States District Court for the Eastern District of

10     North Carolina.  We're here today for a status conference

11     in three cases only -- five cases, depending on the math.

12          So, why don't we just, for -- I recognize a lot of

13     familiar faces, but we'll start with counsel for

14     plaintiffs, and then we'll hear from counsel for

15     defendants.  If you'd just introduce yourself again.

16               MR. LEOPOLD.  Thank you, your Honor.  Good

17     morning.  Ted Leopold on behalf of the class plaintiffs.

18               THE COURT:  Good morning, Mr. Leopold.

19               MR. HOUSE:  Good morning, your Honor.  George

20     House, for the Brooks firm, on behalf of Cape Fear Public

21     Utility Authority.

22               THE COURT:  Good morning, Mr. House.

23               MR. MORRISEY:  Good morning, your Honor.

24     Stephen Morrisey, Susman Godfrey, for the class plaintiffs.

25               THE COURT:  Good morning, Mr. Morrisey.

```
 1              MR. BUNCH:  Good morning, your Honor.  Doug

 2   Bunch from Milstein, also for the class plaintiffs.

 3              THE COURT:  Good morning, Mr. Bunch.

 4              MR. REILLY:  About a third done, your Honor.

 5   Good morning.  I'm Ken Reilly on behalf of Chemours and Du

 6   Pont, your Honor.

 7              THE COURT:  Good morning.  Good to have you

 8   here.

 9              MR. SHERK:  Good morning, your Honor.  John

10   Sherk, also on behalf of the defendants.

11              THE COURT:  Good morning, Mr. Sherk.

12              MR. ANSTOETTER:  Good morning.  Mark Anstoetter

13   on behalf of the defendants.

14              THE COURT:  Good morning.

15              MR. FELDMAN:  Good morning, your Honor.  Stephen

16   Feldman, Ellis & Winters, for the defendants.

17              THE COURT:  Good morning, Mr. Feldman.

18              MR. SASSER:  Good morning.  Jonathan Sasser,

19   Ellis & Winters, for the defendants

20              THE COURT:  Good morning, Mr. Sasser.

21         All right, there are a number of things to discuss,

22   but first I gather that there remains essentially an

23   impasse on the issue of expedited discovery.  I don't know

24   if you wanted to add anything on that, Mr. Leopold, and

25   then I'll hear from Mr. House.
```

1          MR. LEOPOLD:  Thank you, your Honor.

2      Not much more to add other than what's in our papers.

3  The parties had worked cooperatively for the first several

4  weeks and had come, I think, to a resolution where we were

5  at; and then, which is certainly appropriate, new counsel

6  came in.  We seemed the have a little bit of a loggerhead

7  in terms of the last issue, which is us wanting to test for

8  the toxins that we believe are important to test.

9      And that's really the only -- my understanding, the

10 only last issue we have.  And a secondary issue is that

11 they have -- they, meaning the defendants -- are insisting

12 on using their protocol for the testing.  We, of course,

13 once we take the samples, want to use our protocol, which

14 is the EPA protocol, for the testing.  And defendants can

15 test however they wish.

16     We also told them that we're willing to -- and we had

17 made this arrangement with them, an agreement -- to provide

18 them how we are doing the testing, what our protocols are,

19 and if they want to duplicate it, they are more than happy

20 to do so.

21          THE COURT:  Okay.

22          MR. LEOPOLD:  Oh, your Honor, excuse me.  Just

23 one other issue that was not on the radar at the time of

24 our January hearing, which is now certainly on the radar --

25 and the Court may be aware of this -- the state has

```
 1   interceded in terms of the air-pollution-related issue on
 2   the smokestacks, and we also, while we're there on the
 3   premises, wanted to do, with the appropriate protocol, the
 4   smokestack testing, as well.
 5              THE COURT:  And what would that involve?
 6              MR. LEOPOLD:  That involves taking some air
 7   samples, and, in terms of the type of testing, we have set
 8   forth and provided to the defendants what that protocol
 9   would be.
10              THE COURT:  And is there -- is there -- but
11   there's not an agreement on that part?
12              MR. LEOPOLD:  My understanding, at least at the
13   last time we had a discussion about that, since the
14   defendants have stated to us, since it was not teed up at
15   the January hearing --
16              THE COURT:  Right.
17              MR. LEOPOLD:  -- that this is a, quote, new
18   matter, that it's not on the protocol list, and, therefore,
19   they are objecting to us doing that.
20              THE COURT:  All right.  Mr. House?
21              MR. HOUSE:  As Mr. Leopold said, we've asked for
22   a scope -- they asked us what we were going to test for.  I
23   don't know that we reported to you the last time, your
24   Honor -- or we even agreed to tell them what we were going
25   to test for, because part of what we test for, we don't
```

1    know what we are testing for, as we explained.  But we did,

2    in good faith, tried to give them everything that we knew

3    we were going to test for.

4         The authorities have a certain number of parameters

5    they have to test for in their water.  So, what we'd do,

6    we'd just send them a copy of what we had to test for, and

7    said we'd like to test for these.  They included some PFCs,

8    because we have very little in our current testing about

9    PFCs, other than now the GenX, the PFOAs and the PFOASs.

10   There are requirements to test for PFOA, a  compound, and

11   to test now for GenX.

12        The other -- I want to get one subject first, then

13   come back to PFC compounds.

14        There is a list, a suite of things, that we test for

15   every day, including for any compounds of other substances,

16   that I would say that we don't have any reason to believe,

17   from the processes, they are there; but since we run the

18   same test every time since we've had some concern about the

19   thoroughness and/or the truthfulness of the testing that is

20   done by Chemours, we asked to test everything we test for.

21   We thought that would be a simple way of eliminating a lot

22   of compounds that would be in dispute, not in dispute, and

23   would be consistent with the same test we ran every time we

24   ran a test ourselves.

25        The defendants took the position that we couldn't

1  test for anything more than the PFC compounds, and,

2  therefore, we were barred from testing the other suite of

3  compounds that we'd normally test for, saying that it's

4  irrelevant to our situation.

5      I don't believe it's irrelevant.  The utilities

6  believe it's a reasonable test to check their discharge to

7  see if any of the other compounds are there.  We have no

8  reason to anticipate they are.  We have no reason to

9  anticipate they're not.  So, we thought it was a simple

10 solution to check it once.  So, the loggerhead there is can

11 we test for beyond the existing PFC compounds.

12      One of the filings we had made for you was our

13 authority to report to the Legislature on House Bill 56.

14 And your Honor's got that in the file.  And it makes some

15 important points.  One is that the PFCs are throughout the

16 sediments of the river in different volumes.  So, we know

17 we've got a sediment problem.  We're not sure exactly how

18 to compare the solid samples in the sediments with the PFC

19 compounds that are in the water.  That's in further study.

20 But we know we have sediment in the river that will be most

21 likely releasing to the river for a long period of time.

22      The second thing we found is that, when we did the

23 testing with the University of North Carolina at

24 Wilmington, they produced not two, but 33 different

25 perfluorinated compounds.  So, there's a whole suite of

1   compounds out there that are perfluorinated --
2   perfluorinated -- and it isn't just GenX.  And limiting us
3   to either GenX or limiting us to GenX PFOA doesn't resolve
4   the problem, because, as the chart which we presented
5   showed, when you add them all together, they well exceed
6   140, even now when we're dramatically down with GenX.  We
7   don't know the synergistic effect of these chemicals.  We
8   don't know the individual effect of these chemicals.  There
9   is so much unknown about these chemicals that we need to do
10  further research.

11         So, we want freedom in what we test for, because
12  there is very little history of anybody having tested for
13  them before or having them identified.

14         So, I didn't perceive that when we left this
15  courtroom that we were somehow restricted to only testing
16  for a limited number of PFC compounds or that we couldn't
17  test for everything we wanted to.  I thought we left with
18  the right to test to see if there was a problem.  That one
19  of the central disagreements.

20         And, obviously, we'll live with what the Court
21  decides here on this issue, but we thought it was fair.  As
22  our studies have shown us, we've got a real problem in this
23  whole river with this issue and from air depositions, as
24  now it's proven from the work the state's done, that this
25  is almost ubiquitous in the environment of the Cape Fear

1    south of the Chemours plant.

2       And, again, the utilities problem here, your Honor,

3    is not so much what was the history, although that's

4    important, it is what kind of design do we have to have in

5    a plant.  And we have now come to a preliminary design,

6    that's been published, that we are looking at putting in

7    granular-activated-carbon filter system, that the cost of

8    those systems are in the approximate range of $40 million

9    to put in.  It's a huge commitment to our individual rate-

10    payers to float another bond issue for $40 million to

11    address these issues.

12       So, knowing what's there is really important.  And

13    that backs up to the question of where we test.  We want to

14    be -- before there's any treatment, we want to know what it

15    was at the maximum that it could have been.

16       The defendants make points about the fact that

17    they've changed their processes.  Things that change are

18    not the same.  That may be true.  But we suspect that the

19    makeup of the products before they're treated at all remain

20    the same.

21       And, as we pointed out in the letter we showed you

22    the last time, even their own engineers said in order to

23    really get an idea, you need to find the maximum

24    concentrations which is in the material before you treat

25    it.

1    So, the treatment -- getting these samples at where

2 they could be the most descriptive of what type of

3 chemicals are being released before treatment leaves us the

4 ability to figure out what type of chemicals we need to

5 look for in the sediment and in our water column.  So, I

6 don't know if we're still in dispute about the PFC

7 compounds, but we want to be able to have some freedom to

8 experiment with the sample in order to try to find out what

9 is in there.

10    The other issues, I think, Mr. Leopold's addressed on

11 the history question.  But we've provided the Court with

12 where we are.

13         THE COURT:  What about where your clients are on

14 the smokestack testing?  Do you all want to do that, too?

15         MR. HOUSE:  The smokestack testing, yes.  But

16 let's -- the state has concluded -- and you'll see in their

17 responsive materials they filed most recently and the

18 state's complaint that triggered that -- the state has

19 concluded that there is a substantial amount of air

20 deposition which is causing the groundwater problem all

21 around the plant, which is, obviously, also landing in the

22 river.

23    So, we've got the release of groundwater going into

24 the river from the air deposition, then we've got the air

25 deposition directly to the river.  So, understanding the

1    quantity of the pollutants coming out of the stack is

2    important from those two purposes, groundwater release to

3    the river and air deposition.

4         We don't represent -- the authorities -- they don't

5    represent the individuals who are complaining about --

6              THE COURT:  No, I know, but I'm just trying to

7    make sure I understand your position on whether -- with

8    respect to the redesign -- that your engineers and the

9    people that are assisting you all with that think that that

10   information is important to them to redesign what you all

11   are doing with respect to -- to what your responsibilities

12   are.  See what I'm saying?  I mean, I'm sure I get with

13   respect to the --

14             MR. HOUSE:  It -- I don't want to overstate

15   this.  I want to be honest with the Court.

16             THE COURT:  Right.

17             MR. HOUSE:  The deposition -- the makeup of the

18   discharge is important to us, whether it's three PFCs or 33

19   PFCs.  I would guess that because the process is an air

20   emission versus a water discharge, that there are

21   differences.

22        So, initially, we are currently concerned about what

23   they are.  It may turn out that the air discharges aren't

24   as significant to us as the water discharges.  In fact,

25   logic would tell me that's going to be the case.  But

there's no reason not to at least find the answer out what are the air emissions and how are those speciated down to the individual PFC compounds.

THE COURT: I mean, I thought at the last hearing I had a pretty good sense about how the water samples would be gathered. And I realize this may not be primary issue, and Mr. Leopold can supplement; but tell me how a smokestack emission sample is even gathered.

MR. HOUSE: Well, these are protocols -- we're not asking to change the protocol for the existing air permit. Under their existing air permit, they have to sample smokestacks. And, your Honor, there are various ways of doing it, but, normally, you'd run a tube through a hole in the stack to the other side of the stack, and you test the air going out by the volume, and that particular tube takes in the sample. It's a common methodology through all of our industries for sampling air samples.

We're not asking to do -- we're not asking to do an air sampling that's different from the sampling that they or the state would normally do.

What has concerned us, as you would see from the state's letter and in its more recent complaint, is that originally what was -- the GenX number, just that one compound, that GenX number, the state was under the impression that it was one number, a fairly low number.

1    Namours came back and said, in December or late last year,

2    whatever it was, that it's a bigger number.  The state,

3    looking at it, said, no, no, it's a much, much bigger

4    number.  So, within one year, now, this number has grown

5    dramatically.

6         And, again, I think our interest here, the

7    authority's interest, we know the GenX number, because they

8    and the state are talking about GenX number.  We don't know

9    what else is in that air sampling.  But we're not asking to

10   do a different kind of air sampling.  It's the same air

11   sampling.  We would just sample for more compounds than

12   historically have been sampled for.

13        Does that make sense?

14             THE COURT:  And how often does the state do that

15   sampling pursuant to its permit?

16             MR. HOUSE:  It depends upon the air permit for

17   an industry.  It could be annually.  It could be every five

18   years.  Air sampling has different kinds of protocols.  I

19   honestly don't --

20             THE COURT:  Okay.

21             MR. HOUSE:  I've looked at their permit.  I know

22   what they're sampling for.  I wasn't paying attention to

23   protocol that may have been required once every five years,

24   when they renew the -- air permits are good for five

25   years -- and once every five years they come back up.

1    The issue for isn't exactly -- we don't want to

2  change the sampling methodology and the sampling ports.  We

3  want to use the same ones they use and the same ones the

4  state uses.  What we want to do is take the sample and know

5  what's in that sample more than just GenX, if that makes

6  sense to you.

7    We're not asking to do anything unusual, as far as

8  drill another hole in the plant, putting some type of weird

9  sampling device on.  We're asking to collect the sample and

10  then be able to speciate that sample into its various PFC

11  compounds.

12    So, we're -- it's a slightly different need.  And, as

13  I've said to you, the water samples are clearly the most

14  important thing to us, because that's the biggest volume.

15  We are still mystified about the amount of PFC compounds

16  coming  out of the air such that it's causing the

17  groundwater probable, which is -- when we had our last

18  hearing, it was unexpected to us.

19        THE COURT:  Okay.  Thank you.

20    Mr. Leopold, did you want to add anything else?

21        MR. LEOPOLD:  No, your Honor, just specifically

22  as to the point that the Court inquired about the air

23  sampling.

24    Basically, there are very specific US EPA guidelines

25  essentially taking the fugitive air qualities from the --

air sort of leaks out from various piping, which is normal, and you just take those samples. It's not intruding on anything. It's not destructive in any way. It's not taking apart any pipes, anything of that sort. All under the US EPA guidelines that are standard and appropriate that are done on a regular basis. And we would take those samples and also do appropriate testing along those lines in the protocol that we would wish to do.

THE COURT: All right. I'll hear from Mr. Reilly or whoever wants to speak next.

MR. REILLY: Thank you, your Honor. Let me begin by -- I want to bring some clarity and some facts to this discussion. Not just lawyer talk, but I want to bring your Honor some actual hard evidence about what we're talking about here today. But I was very interested that Mr. House indicated that this non-PFC testing that brings us here today, he just acknowledged, has nothing to do with the Chemours plant. And that's what -- that's the objection that stopped our discussions. And so, I find it a fascinating acknowledgement on his part. And, quite frankly, that's where our discussions broke down, and that's why they filed a motion.

And, in fact, your Honor didn't order, at the hearing in January, that sampling occur. What your Honor instructed the parties to do was to get together and see if

they could agree on something; and, if they couldn't, come

back and you would listen to the arguments and then you

would make a ruling.

As far as air sampling is concerned, I'll get into

that in greater detail.  But, quite frankly, your Honor,

that's not before your Honor today.  And we would have a

lot to say about it, because all the things that you just

heard will provide you with concrete, factual,

evidentiary-based information that says that's just not so.

There is no EPA standard for making determinations of

PFC testing through stack testing.  As a matter of fact, we

submitted to your Honor as a supplement to our prior

submissions that last very voluminous -- and I apologize

for the size, but it's the amount of work that went into

it -- the submission that Chemours did to the Department of

Environmental Quality that we addressed, among other

things, air sampling in enormous detail.  And, in fact,

what you will learn from that is that there is no EPA

standard for doing stack testing for PFCs.  That had to be

created by Chemours in order to determine how you capture

these substances, how you control these substances, how you

extract these substances from whatever you attracted them

with, and then how you test for them.

So, you will learn, when this issue is appropriately

addressed, teed up, that this is anything but this snap

that was described by counsel, because it simply isn't so.

As a matter of fact, the DEQ was going to do its sampling along the sampling that's already been done by Chemours. It's already been done. The testing has already been performed. The analysis of the testing has already been performed. And it's already been submitted to the Department of Environmental Quality. And the results are available to everybody. And I offered that to everybody.

I said, hey, if you want to know what the results of the sampling have been, the -- the DEQ said, you know what? This is too hard. You guys do it. We'll accept your results. You guys do it. So, that's the way it worked.

So, let me go back to -- okay, so what is this emergency sampling issue all about? When the parties came before you in January, the position of the plaintiffs was, and especially the water companies, was we are in need of being able to determine what is in the water, because we know GenX is in the water, but we don't know what other PFCs may be in the water.

Testing being performed by others, and perhaps by the folks at the water companies, as well -- we haven't seen their testing completely yet -- but at that moment they said, we don't know what all is in the water. You heard Mr. House, just a moment ago, said there may be 30 compounds that are relatively similar to GenX.

1          Well, in fact, at the very moment they were before

2     you in January, both water companies had already engaged

3     consultants.  In the case of Cape Fear, it was Black &

4     Veatch, an engineering company out of Kansas City,

5     Missouri.  In the case of Brunswick, it was an outfit by

6     the name of Smith.  I'm not as familiar with them as I am

7     with Black & Veatch.

8          But those folks were hired to, and they did, engage

9     in extensive analysis of the water being brought into and

10    delivered out of both Cape Fear and Brunswick.

11         And I'm told that I have an ELMO in front of me, your

12    Honor.  I don't know exactly how to work it.  I'd be happy

13    to hand up some demonstratives here.

14              THE COURT:  That's fine, however you want to do

15    it.

16              MR. REILLY:  What I'm going to show you first is

17    that both Cape Fear and Brunswick, through the work of

18    their consultants, have already tested for and identified

19    the presence of the various substances that, when we asked

20    them what PFCs are you going to be testing for, they

21    already had that information.

22         Will you open that?  I'm sorry to take the time, your

23    Honor, but if you could open that for -- open it to the

24    PFCUA slide.

25         May I approach, your Honor?

1                    THE COURT:  You may.

2                    MR. REILLY:  Thank you.

3                    THE COURT:  Thank you.

4          (Counsel conferring off the record.)

5          So, after -- well after we were here, and, quite

6    frankly, after our negotiations had broken down because of

7    the requirement that they be permitted to test for these

8    nonrelated substances, which I'll get into in a little bit,

9    we learned that Cape Fear had already been provided by its

10   consultants, Black & Veatch, as of March 30, 2018, this

11   list of chemicals that they tested for and identified.

12         If you turn the page, your Honor, you'll see that

13   Brunswick County had done exactly the same thing through

14   its consultants, Smith.

15         If you turn the next page -- this is really the ham

16   in the sandwich, as I say, and that is we matched up what

17   they told us they were going to test for.  And we didn't

18   have any objection to them testing for all of these PFC

19   substances.  They aren't all PFC substances, actually, but

20   we didn't have any objection to them testing for all of

21   these substances.

22         But when we compared what said they desperately

23   needed to be able to design a treatment system for their

24   respective water plants, we looked and compared to see

25   whether or not what their consultants had already tested

1    for, already evaluated, and had already designed treatment

2    plans were included.  And the answer is yes.

3          You can see from the checkmarks that, especially in

4    the case of Brunswick -- and I'm sure these guys share

5    information -- I would be surprised if they didn't -- but

6    they had already tested for, identified and reported on

7    virtually every one of these substances.  The only

8    exception that I see here, especially in the case of

9    Brunswick, was a substance identified at PFODA.

10          So, to say that they were in desperate need, they

11   couldn't really identify what was in their intake water or

12   because their current treatment apparently doesn't treat

13   any of this, so it's in their intake and their outtake --

14   in other words, what's being sold to customers -- they

15   actually did know the answer to all those questions.  And

16   if there ever was an urgency to this testing, you can see

17   it doesn't exist.

18          But, in addition to that, if you turn to the next

19   page, you'll see that the utility companies have already

20   identified various filtration methods.  Each of the

21   consultants have identified three potential infiltration

22   systems to add to their existing facilities.

23          Now, interestingly, they came to -- their consultants

24   came to different conclusions as to what filtration system

25   ought to be incorporated.  And they went through analyses

1    of -- I don't want to bore your Honor with, you know, why

2    they came to the conclusions they did, but the Cape Fear

3    consultant said, hey, you guys ought to put in what they

4    call a GAC system, an activated charcoal filtration system,

5    two layers of it, as I understand it.  And that's on the

6    next page.

7         You've got a page that is titled, CFPUA has informed

8    its customers that granular activated carbon has been

9    proven effective.  This is what Cape Fear has already told

10   its own customers.

11        So, to come here today and say, we don't know, we

12   need emergency testing, after they just told their own

13   customers that they don't know is, quite frankly,

14   incorrect.

15        So, how about Brunswick?  Same position.  Same

16   situation.

17        Brunswick has already received, on the next page, an

18   individual recommendation on filtration method.  And keep

19   in mind these are substances that nobody's established are

20   harmful to humans.  And certainly not -- as we're going to

21   see in just a minute, what levels of presence these

22   substances are in in their intake water, their raw water,

23   what they call their raw water, and their outflow water

24   there, the water they sell to their customers.

25        So, Brunswick as already received an individual

recommendation on filtration system.  I'll talk about that
in just a minute.

And, if you go to the next page, Cape Fear has
already authorized implementation of their filtration
system, the GAC system.

The system that was recommended by Brunswick's
consultant, Smith, was a different filtration system, one
called reverse osmosis.  And the reverse osmosis system was
actually considered and rejected by the Cape Fear folks.
They have their reasons, not important to the case at this
juncture.

And, of course, the next page indicates to your Honor
that Brunswick County has also already authorized the
implementation of the recommended filtration system for
Brunswick.

Are these systems already in pilot performance?
Yeah, they are.  Have these consultants already represented
to these litigants, who are saying, your Honor, we are in
desperate need of this information, have they already
informed their clients that these systems resolved the
problem?  Yeah.  They apparently resolved the -- they
create the elimination of these substances in their
finished water, along with resolving a whole host of other
problems, the kind of problems that Mr. House mentioned,
that he knows, that his client knows are in the water,

1  unrelated to Chemours, and which the water companies have

2  to deal with.

3      So, what we did was we objected to these folks

4  because they were totally unrelated to why they came to

5  your Honor.  The emergency, if it ever existed, is clearly

6  not present.

7      But if the condition ever warranted some sort of

8  action by your Honor on an urgent basis, it definitely

9  didn't include -- and this is what we wrote to them and

10  said we object to -- searching for volatiles, semi-

11  volatiles in water, dioxins, polychlorinated biphenyls and

12  pesticides, perchlorates, heavy metals and trace elements,

13  total cyanide, bromide, phenols, silica, nitrates,

14  estrogens and hormones, pharmaceutically active compounds.

15      Yes, are these things all found in the Cape Fear

16  water?  Probably so.  Is it incumbent on water companies to

17  protect their customers against these substances?  Probably

18  so.  I don't represent water companies, so I don't know

19  exactly what their obligations are.  But probably so.  But

20  why are they coming to your Honor asking you to, on an

21  basis, allow them to test for all these substances when

22  they've just acknowledged in front of you that they aren't

23  related to Chemours.  And, obviously, they're not.  We're

24  not in the pharmaceutical business, we don't make estrogens

25  or hormones, we're not in the -- I mean, this is -- so, we

1    objected.  We objected.  We said, you know what?  On top of

2    that, Cape Fear told us, you know what?  We have to report

3    the results of whatever sampling we do.  We have to report

4    it.  We have to make it public.

5          And we said, wait a minute, this isn't right.  You're

6    going to announce to the world that Chemours has all these

7    substances in its water.  Are you going to be announcing to

8    the world that, oh, by the way, they're not from this

9    plant?

10          I don't know -- there's an article coming out,

11    virtually, for sure, every week about the Chemours plant.

12    It is a media darling.  Probably a bad word.  People will

13    tell me, oh, my goodness, Reilly, you didn't say darling.

14    But the bottom line is they are frequently in the media.

15    No question about it.  And so, can you imagine the coverage

16    of, oh, look at all these substances that are found in

17    Chemours' wastewater.  It would be completely unfair.

18          And so, we objected.  And we said, hey, why?  And we

19    really didn't get a very good answer back.  And so, that's

20    the reason why we're here.

21          Well, to talk more about the urgency of the

22    situation -- your Honor, if you turn to -- I think it's the

23    next page.  It's the one that says, levels of GenX in the

24    Cape Fear River.  It might be two down.

25          So, what you see is that the DEQ, the North Carolina

1 Department of Health and Human Services, as of July, 2017,

2 created a provisional health goal of 140 parts per trillion

3 of GenX. And what is a provisional health goal? This is

4 a -- I won't get the wording exactly correct -- but it

5 basically says, at this level, even the most susceptible

6 person, an infant, that's going to be drinking this water

7 at volumes that infants might consume water, for the rest

8 of your life, does not present a health issue.

9     So, if you turn the next page, you'll see that the

10 Cape Fear folks have already acknowledged that in terms of

11 the presence of GenX in the -- their raw water intake --

12 that chart is one that was provided by Mr. Fletcher, who

13 is, as I understand it, the head of Cape Fear. And this is

14 a chart that he used in a presentation that he made before

15 the House Select Committee. And it showed that ever since

16 July of 2017 -- in other words, for almost the last whole

17 year the level of GenX in their water intake has been well

18 below this 140 parts per trillion.

19     If you turn to the next page, you'll see that that's

20 been true not only for Cape Fear, but also for Brunswick.

21 The numbers for Cape Fear are on the left side. Their

22 testing was done -- this was their most recent testing --

23 April 5th, April 12th and April 19th, their levels of GenX

24 in their water, raw water -- that's their intake water --

25 were measured by their consultants at 5.6 parts per

trillion, 27.5 parts per trillion, and 4.95 parts per

trillion. Their finished water was similarly very low.

On the right-hand side you have Cape Fear's finished

water values, also provided by Cape Fear, and they measure

from January all the way through April 17th. And their

values are also either in the 37, 40, but as we get closer

to today, they're down into the single digits and very low

double digits in terms of parts per trillion. Way below

140 parts per trillion.

All right. So, is there really an urgent need for

this water sampling? Well, clearly, not based on the

arguments that were made by plaintiffs' counsel today nor

back in January. And your Honor already observed at the

last hearing -- and I apologize for not having been here --

but your Honor pointed out that ordering sampling, letting

people come on your premises and sample, is not something

that is done willy-nilly. You really have to have a good

reason to do it.

So, now, anticipating another argument that I think

plaintiffs' counsel's going to make, is -- they say, well,

if we don't get a chance to come on and measure your --

look for these chemicals in your wastewater stream today,

then how will we ever know at what volume you were putting

them into the river way back before you stopped putting

this material into the river at the direction of the DEQ.

1    And we've tried to explain to them that this is a

2    complicated facility.  It operates at -- running different

3    what they call campaigns or different products at different

4    times, even within a given product in a given day, it will

5    run differences.  There is no -- what they ask for is a

6    representative sample of what was going into the river.  We

7    say there is no such thing.

8    Today, and for the last six, seven months, all of the

9    wastewater has been leaving Chemours and being shipped out

10   to either Oklahoma or Texas.  It has not been combined with

11   the noncontact water.  And unless you have the combination

12   of the noncontact water, which is millions of gallons of

13   water, in addition to the wastewater, you have no idea what

14   the level dilution was, what the level of concentration was

15   going out the outfall at Chemours.  No way of knowing what

16   was going into the river.  It can't be replicated today.

17   Is there information about what was the level of

18   GenX, for example, going into the river before these

19   changes occurred?  Yes.  This is probably the most sampled

20   substance of North Carolina for sure.

21   If you look back -- all of this is publicly available

22   on the EPA and DEQ's records on their web sites.  You can

23   see that in June -- I think it was June 19th of last year,

24   a year ago, they sampled for GenX in the river at Chemours

25   outfall to see what was the level of GenX.  Now, back then

```
1   in June, the guidance level was 71,000 parts per trillion.
2   In July the DEQ changed -- reduced the number from 71,000
3   all the way down to 140.
4       But you'll see -- and we can provide it to your Honor
5   if you'd like to see it -- that the results obtained by the
6   DEQ, the EPA, on June 19th was -- and even in the same day,
7   the variation was between roughly 20,000 and 40,000 parts
8   per trillion.  On the same day there was a hundred percent
9   variation.  But if you want to know what was going into the
10  river then, there you have it.
11      Now, today, to go to our waste stream that isn't
12  being diluted, that isn't being treated, it's also not
13  being treated as it was back then; you end up with what I
14  colloquially call garbage in garbage out.  You don't get
15  information that's usable in any form in this litigation.
16  It's not diluted.  It's not treated.  And the run of that
17  day, there is no standard run.  It's not like going to a
18  General Motors assembly plant, and today we're running
19  Buicks.  Oh, this is our Buick plant, so today we're
20  running 500 Buicks an hour.  It's not that kind of
21  operation.
22      So, this is -- I'm not standing here saying, you
23  know, we're completely opposed to any sampling at some
24  point in time.  I am opposed to air sampling, because not
25  only is it extremely difficult --
```

1                  THE COURT:  I understand that.  The air

2     issue, I don't think, is before me today.  But I'm trying

3     to understand, if you agreed to -- if the core of the

4     dispute is ultimately what they test for, then there was an

5     agreement on gathering the samples and then letting them

6     test.  I mean, your argument about each -- essentially --

7     or what I took from it was that each day is different.  So,

8     it's not --

9                  MR. REILLY:  Right.

10                 THE COURT:  -- it's not an assembly line of the

11    2017 Cadillac Escalade coming off the run.  And each day

12    what's going to come out of that is going to be different.

13    But you all were still open to allowing that to be

14    analyzed, with some limits on what's tested.

15         So, there seems to be a little bit of a disconnect to

16    me there.

17                 MR. REILLY:  And I appreciate that, your Honor.

18    But I wanted to make sure that your Honor understood that

19    if there was ever urgency, it doesn't exist.

20         But Chemours -- you know, they've taken the position

21    of we want to be transparent.  They've taken the position

22    that you need to understand that if you come here and test,

23    sample, you're not going to get what was going into the

24    river back in any earlier point in time.  And I want your

25    Honor to know that, too.

1    THE COURT:  I understand.  But, you know, I'll

2 hear again in particular from Mr. House.  I think part of

3 the whole issue was trying to make sure what the utilities

4 are designing is going to do as reasonably effective a job

5 as it can in keeping things safe for the people that drink

6 water in those areas.  I mean, at its core.  And so, it's

7 not in connection with a plant redesign.  It's -- you know,

8 if I allow this, it's not at all a ruling on the

9 admissibility of any of it.

10    And your papers pointed out that -- and you and

11 Mr. Leopold and Mr. House, all the lawyers that do this

12 kind of work, know that in these types of cases there are a

13 lot have Daubert motions, to put it charitably.  But we're

14 not even close to that.

15    MR. REILLY:  Right.

16    THE COURT:  All right.  Anything else that you

17 wanted to tell me?

18    MR. REILLY:  We have submitted to plaintiffs'

19 counsel a protective order about what can be done with this

20 information, and that sort of thing.  And we said, hey, for

21 purposes of this litigation, we don't have a problem; but

22 the dissemination of this information to the media, and

23 things like that, what -- we're opposed to that.

24    This is not supposed to be a media event.  And so,

25 they said, no, no, we're obliged by law to report any

sampling we do.  And I swear, I searched.  I could not find

where -- if their lawyers get to come on somebody else's

facility and do sampling, that that required Cape Fear, or

anybody else, to report the results of that testing.

So, I said, you know what, that doesn't seem right,

either.

Now, I'm not going to be surprised if Cape Fear,

because of its role as a public utility, has an obligation

to report whatever it's sampling for whatever is coming

into its facility and whatever is going out in the finished

water, that may well be.  But we're not talking about that.

We're talking about coming onto the Chemours site and

testing the Chemours wastewater stream that hasn't even

gone into the river, and now you're going to -- Cape Fear

is going to report that?  I mean, it bears no relationship.

We have the data as to what was the level of, for

example, GenX going into their facility.  They have that

data.  We would love to see all their data, too.

They have not made an offer to provide us with their

data about what's been going in -- what they've been

measuring in their facility.

But it's just the use of the material.  For

litigation?  Great.  I think it has no value in this case,

but that will be, as your Honor points out, that's an

argument for another day.  But in terms of where is this

obligation, why can't you agree that this will be used --
you can provide it to your consultants, you can provide it
to the Court, that sort of thing.  But are we trying to
make a media event out of this, too?  And I'm opposed to
that.

Thank you, very much, your Honor.

THE COURT:  Thank you.

MR. REILLY:  Before I sit down, let me make sure
from my many friends if I've missed something.

No.  Thank you, very much, your Honor.

THE COURT:  Mr. House, what would be -- if it is
the utility's position, what is the legal obligation?  Do
any tests that any of your experts conduct in any
litigation that the utilities are engaged in, you
automatically make all that -- you are required by North
Carolina law, or something, to make that publicly available
if your client is in litigation?  That's unique.  That's
interesting.  I've never heard of that.

MR. HOUSE:  No, I never made that argument, your
Honor.

THE COURT:  Okay.

MR. HOUSE:  I've told them the public records
law applies to anything that we have that are public
records.  Now, the reason that we've asked to give the
information is to provide it to our engineers to help with

1    redesigning the plant.  So, you can't have the engineers

2    who's got it to redesign the plant, say they can't use the

3    information and tell why they're doing what they're doing.

4         But let's goat back to -- I've got to give it to the

5    engineers.

6              THE COURT:  Well, I understand that.

7              MR. HOUSE:  I'm not going to sit there and hold

8    it in my pocket.  It doesn't do me any good.  The engineers

9    have got to use it to determine -- I'm not after --

10   remember, I'm not after quantity.  I'm after what are the

11   constituents that they are discharging.

12             THE COURT:  Right.

13             MR. HOUSE:  And that's where he and I miss each

14   other completely on this matter.  I'd go back to the

15   argument that I made with you the day we were here to read

16   their consultant's letter in 2002, but DuPont's letter to

17   the state.  It says, there may be hundreds of these

18   by-products at low concentrations.  Now, in 2002, we're

19   talking about parts per billion.  In 2017, we're talking

20   about parts about per trillion.  That's the advancement of

21   science.

22        What I want to know is what's in those amounts, those

23   potential discharge amounts, so I can then look for them.

24        The lower the concentration -- as that very same

25   letter said, the lower the concentration, the lack of

1 ability to detect it.

2      So, I'm not looking at it when it comes into my

3 intake as to what could have gone into the river over a

4 period of time, because the detection limit may be -- on

5 these particular compounds, we don't even know what we're

6 looking for and the detection of it may be impossible to

7 determine.

8      If we get a chance to look at the hundreds of

9 byproducts, we may find that not only are there 33, there

10 may be 75 different chemicals.

11      I find it unique to say that because the authority

12 has got to do something to protect the citizens and is

13 trying the best it can to figure out what's coming in, that

14 we can't look at what they've got as the source.  I want to

15 know what's at the source so I can then say, hmm, I didn't

16 know about this compound, number 34, 35, 36 and 37.  I want

17 to go test and see how I know it was in the discharge.  Is

18 that in our intake.

19      And there were no tests on GenX until 2017.  We don't

20 know the history of this plant.  That's absolute baloney.

21 They didn't test for it.  At least, they've told us they

22 didn't, because that was one of the things we argued about

23 the first time.  You have tests.  But we don't have these

24 tests.  Now, they may have them, but they haven't told us

25 about them, and they didn't give them to the state.

1    Our material -- we report our test results every week

2  on the CFPA letter.  We give the public the list of

3  everything we test for.

4          THE COURT:  And your testing is at your intake

5  and at your outtake?

6          MR. HOUSE:  And the outtake.

7          THE COURT:  Right.  And that's why -- I mean,

8  and I totally get that, but just on the issue of -- I mean,

9  protective orders are pretty standard in a lot of

10  litigation, and in terms of testing that your consultants

11  do in connection with the litigation, it just seems

12  different to me than testing at the intake and outtake of

13  your facility.  And I don't have the statute in front of

14  me, but most statutes that deal with public records have an

15  exception for court orders, and that's why, when states are

16  involved in litigation, and there's an exception, and it's

17  not publicly available, because the Court said it's not to

18  be.

19          MR. HOUSE:  And if you say it's not to be, Judge

20  Dever, I assure you it won't be.

21          THE COURT:  Right.

22          MR. HOUSE:  So, I don't -- I didn't know how to

23  divide between taking and giving it to my engineers, then

24  coming back, and them reporting it to the board, saying we

25  recommend this type of treatment now that we know this

1    information different, and not telling a lie.

2              THE COURT:  No, I understand.  And that -- I

3    mean, again, that can be something to cross down the road.

4    But at least we're all on the same page that there's not --

5    because I certainly -- I've been around a while, not as

6    long as some, but I've just never heard of any state

7    authority or an entity subject to the public records laws

8    somehow saying, if there was a federal court protective

9    order, they weren't going to comply with it.

10             MR. HOUSE:  Absolutely we would comply with such

11   an order.

12             THE COURT:  Right.

13             MR. HOUSE:  We would do so.

14             THE COURT:  Okay.

15             MR. HOUSE:  So --

16             THE COURT:  And did you all get -- and I want to

17   hear again from Mr. Reilly, did you all even get close

18   enough to an issue about -- I know that it talked -- the

19   proposal talked about over a three-day -- or over three

20   days.  I mean, how much time are we talking about in terms

21   of -- did you all get that far in your discussions on

22   meet-and-confer?  Is it over the course of a 30-day period,

23   you know, or a three-week period, once every Wednesday?

24   You know, did you all get that far?

25             MR. HOUSE:  I thought we had gotten through all

1   the issues regarding testing except for the scope --

2          THE COURT:  Right.

3          MR. HOUSE:  -- which Mr. Reilly has referred to.

4          And if that were the only issue, I think that

5   would have been resolved.  Mr. Reilly is here.  What he's

6   here for is to convince you do not allow the expedited

7   discovery from beginning, with this theory that they've

8   done such a good job of analyzing this, they shouldn't be

9   able to come on and get our sample.  I mean, that, to me,

10  is an absurd statement.

11      We even got one letter from them that said, now that

12  you've identified these 32, we have testing protocols for

13  two of them.  We can tell you how to test for it.  I was

14  absolutely blown away.  Why didn't they tell us that

15  before?  They've probably got testing protocols for all of

16  this stuff.  Well, not all of it, but some of it.  They

17  haven't told us that.

18      We're out here in the dark doing the very best we

19  can.  And they've got the information.  And we can find out

20  what it is we should be testing for.  Now, let's say that

21  we learn from their information that there's a thirty-

22  fourth compound.  Now we test for that in our intake, and

23  we find it in our intake.  Then we may take action because

24  of that.  I don't think that, if we go back and find it in

25  our intake, that would suffer any type of protective order.

1    I can understand you're saying that I can't use what

2 I found in their internal waste stream outside your

3 protective order, but if I take it and then find out what

4 I'm going to go sample for, and then find out that I've got

5 it in my intake, I think that's a public record, because

6 I've tested my intake for it, and I should be able to

7 disclose -- or it should be disclosed to the public.

8    So, again, this whole theory was to allow us to

9 figure out what it is.  And we're doing the best we can.

10 We're over here -- now you're telling me we don't need any

11 more because you've done a good job.  Well, we've found 33

12 of them.  I suspect there's a bunch more.  At least, that's

13 what they say in 2002.  And that's what we're after.

14    And if this deal is all about whether or not I test

15 for the other compounds, and if he'd have made the proposal

16 to me, we wouldn't be here today.  We're here because he

17 doesn't want you to let us test at all.  That's what he's

18 arguing.  Ninety percent of that argument that you just

19 listened to wasn't about my separate compounds for BOCs.

20 It was about whether or not we should be testing at all.

21    That's what this argument -- that's why we're in

22 court today, so they can get another shot at trying to

23 convince you to reverse the order you made back in --

24 December?  Is that when we were here?

25         MR. LEOPOLD:  January.

1          THE COURT:  January.

2          MR. HOUSE:  January.  We've been beating this

3    issue around since January.

4          THE COURT:  Well, I just had ordered you all to

5    meet and confer.  And you all -- and all the progress that

6    you made.  And Mr. Leopold acknowledged it.  I went

7    through -- I read through all the papers and all the

8    correspondence between you all, and that is a very thorough

9    meet-and-confer.

10         MR. HOUSE:  Absolutely.  We've conferred plenty.

11         But with regard to the additional testing, we don't

12   know if that plant discharges or not.  I mean, it's a

13   little unfair to say we know they don't discharge.  That's

14   not the truth.  We don't know -- we didn't know they

15   discharged GenX until 2016.

16         THE COURT:  Right.

17         MR. HOUSE:  Okay?  We don't -- if there are

18   other compounds coming from their processes, we don't know

19   that.

20         THE COURT:  Right.

21         MR. HOUSE:  So, it was a theory that solved two

22   birds with one stone.  If your Honor thinks that's too

23   broad, then fine.

24         THE COURT:  Well, and on the protective order

25   issue, again, there's a difference between, you know, if

1    you all test for something, and then you decide to change

2    your systems and publicly say, you know, we've tested our

3    intake now -- I mean, that, to me -- I mean, I totally get

4    that, but it's different than saying, oh, by the way, we

5    ran all these additional tests because of some discovery

6    that a judge allowed us to do and that we found this was in

7    some of the things being processed at Chemours.  Right?

8         I mean, that's -- it's different.  It's basically --

9    it's telling the public we're trying to make sure you all

10   have clean water, safe water.

11             MR. HOUSE:  Right.

12             THE COURT:  And so, we've tweaked our system.

13   Again, it's different.  We've all dealt with so many cases

14   with litigation-related protective orders, it's different

15   than them sort of saying, oh, by the way, this is these

16   companies' fault.  Because that's a whole 'nother issue for

17   later proceedings and analysis and Daubert motions, and all

18   the rest of that.  If the utility does test for something

19   and decides we're going to tweak our systems, and

20   somehow -- because I get it.  You know, it's a lot of money

21   that you all are spending.  Because I'm sure your clients

22   are saying we don't want to have to redo this.  I mean, I

23   totally get that.

24             MR. HOUSE:  Yes.

25             THE COURT:  But I -- okay.  I think I

1 understand.

2          MR. HOUSE:  I accept the protective order --

3          THE COURT:  Okay.

4          MR. HOUSE:  -- situation, your Honor --

5          THE COURT:  Okay.

6          MR. HOUSE:  -- from the point of view, as he's

7 expressed today, we never got that level of detail.

8          THE COURT:  No, I understand.

9          MR. HOUSE:  But I'm okay with that.

10          THE COURT:  Okay.  That's helpful for me to

11 know.

12     Mr. Leopold.

13          MR. LEOPOLD:  Thank you, your Honor.

14     Your Honor, I think one of the -- what we've seen in

15 the last half-hour or so is one of the benefits, but also

16 one of the downsides, of all this being consolidated into

17 one case, because, to be crystal-clear, 99.9% of everything

18 that Mr. Reilly has informed the Court deals with 99.9% of

19 what's going on with public utilities.

20     We have hundreds of thousands of property owners and

21 people with serious health issues that we're dealing with.

22 And, so, if we can take a step back, because I think it's

23 important for the Court to, again, be crystal-clear on

24 talking apples to apples what we're dealing with.

25     First, just in terms of the time-line, just a little

1    bit about what Mr. Reilly had to say as it relates to the

2    air quality.  I certainly understand the Court's

3    appreciation that that particular issue may not be teed up

4    today, but I also am sure the Court can understand where

5    we're coming from, that at some point in time, hopefully

6    sooner than later, we would like to do our own testing,

7    noninvasive testing of the air quality.

8         Just because the DEQ has said, oh, it's too difficult

9    for us to do.  We're going to rely on Chemours to do the

10   testing, and we'll rely upon Chemours to give the results.

11   That gives us a little bit of pause, when we know

12   historically, and it is undisputed that there have been a

13   lot of things over the last 30 years that Chemours and/or

14   DuPont has not informed the state of or advised the various

15   toxins that have been dumped into the river.  So, we do

16   want to do our due diligence at some point in time.

17        So, specifically on the issue for which we are here

18   today on, the Court is correct.  The parties were very far

19   down the road in working -- and still working in good

20   faith.  In all of these issues, the impediments seem to

21   have occurred not too long ago when it came to the issue of

22   once you have the materials to test, (a), we're going to

23   tell you how to test it, (b), you can only test for certain

24   things.  That seems to be the stumbling block.  Because we

25   are in agreement, unless something has changed over the

1  last few days that I'm not aware, that we're going to get

2  the before the dilution, in other words, at point zero.

3          THE COURT:  Right.

4          MR. LEOPOLD:  Right?  That's -- the train has

5  left the station on those issues.  The core issue at this

6  point in time is the testing.  And, look, at the end of the

7  day, I don't know why it's even an issue.  What's the

8  prejudice?  There is no prejudice.  They can do whatever

9  testing they want to do.  They can oversee the testing we

10 want to do.  They can contest, which I'm sure they will at

11 some point in time through the Daubert issues, or whatever,

12 the testing you did wasn't accurate, or whatever.  That's

13 fine.

14      But to tell us that you can't do that testing, that

15 doesn't seem to be fair.  That doesn't seem to be just, to

16 at least to me, on the plaintiffs' side.

17      For our client to say, you all are telling us that we

18 can't do this type of testing?  That just doesn't seem

19 right, number one.

20      Number two, the protocol which we want to do, which

21 we believe are under the US EPA standards, are appropriate.

22 They want to contest it, fine.  Contest it sometime down

23 the road with your experts.  Again, Daubert issues at trial

24 or cross-examination, fine.  But don't tell us we can't do

25 it that way.  You're going to get the results.  You're

entitled to the results.  Make of it what you wish.  That's
fine.  So, I don't understand what the prejudice is.

       And I must have heard 20 times this emergency motion.
Well, you know, we're far down the road from the emergency
by now.  We're at the stage where we just need to get the
information to do this.

             THE COURT:  Right.

             MR. LEOPOLD:  The second thing, I was a
little -- with respect to Chemours and DuPont's argument --
again, I want to be crystal-clear, because I was a little
taken aback that we have this very nice 15-, 20-page
printout that was handed to the Court that was prepared by
DuPont and Chemours for this hearing to provide to the
Court.  But the information was information that was
gathered from official, if you will, documents, test
documents, filed by the utilities in court in which
counsel -- counsel -- filed multiple times as filings,
which the Court has indicated probably is sitting in stacks
by the Court's feet here, that the Court has looked at.

       But what I found somewhat odd and curious is there's
sort of pieces picked -- cherry-picked out of those topics
that are in this nice PowerPoint presentation provided to
the Court.  And what we seek is not cherry-picking.  What
we seek is full, complete disclosure and information.

       And I would hope and expect that when Chemours and

1  DuPont stand before this Court that there is not cherry-

2  picking; that the full story is told.

3      And we're all -- some of us in the courtroom remember

4  Paul Harvey, the rest of the story, every afternoon.  Now

5  let's talk about the rest of the story.  And the rest of

6  the story is not cherry-picking.  The rest of the story is

7  that in some of the same documents they took this

8  information it is specifically noted in there that there

9  are at least five new perfluorinated alkaline substances,

10  PFASs, that are part of the review.

11      And, if I may, only because I didn't bring extra

12  copies -- I wasn't aware that this PowerPoint presentation

13  was going to be provided to the Court, but they have it.

14  And I'm referring, so they can pull it, the March 23, 2018,

15  Cape Fear River Public Utility Authority letter that was

16  signed by James Fletcher, the Executive Director.

17      And if I could just -- if I may approach, your Honor.

18          THE COURT:  You may.

19          MR. LEOPOLD:  And just show the Court, this is a

20  very, I think, educational diagram of a pie shape.  And

21  only 14% -- only 14% of the information or toxins are GenX.

22  There are 76% of other perfluorinated acids, PFCAs, that

23  are unknown that have been found.  There is 10% of other

24  PFSAs that have no -- that have been found in the water

25  treatment.  All we're seeking to do is to do testing that

1    can help explain those issues.

2         So, when yes talk about cherry-picking, sure, we all

3    can cite statistics.  You can make whatever out of it you

4    want.  But, in order to be full, open and candid with the

5    Court, we want full disclosure.  We want to talk about the

6    full rest of the story.  And the full rest of the story is

7    that 76% of other toxins that were found in the water in

8    the Cape Fear River that runs along the streams and the

9    valleys in North Carolina to all the people's homes, over

10   $300,000 people affected, tells us that there are other

11   perfluorinated acids, toxins, that have been found.

12        Some may not be part of this company.  I don't know.

13   But if I was a betting guy, I would say there's probably a

14   pretty good chance that for the last 30 years, many of

15   those years of which they didn't disclose even GenX was

16   dumped and polluted the waters of peoples and the rivers

17   and the environment, in the homes, in the piping, that

18   there might be some other things there.

19        And that's all we want to do, is to learn, to get

20   knowledge.  So that the nice opening statement that counsel

21   for DuPont and Chemours gave the Court just now was just

22   that, an opening statement, because there is a rest of the

23   story.  And that's what a trial is about.  And that's what

24   we'll put on during trial; of when it started, how it

25   started, who knew about it, why it was done, why it was

1  uncovered, why it was not disclosed to the state in

2  violations of state permitting.  All of those things.

3  Because that's the rest of the story.

4         So, all we want to do -- we have 80% of the

5  agreement.  We want to go on site for a day,

6  day-and-a-half, whatever it takes, takes to find water

7  samples.  Let us do our testing.  If they want copies of

8  it, they want to do whatever they want to do about it,

9  fine.  But we're not obligated to follow their procedures,

10 their guidelines, and for DuPont and Chemours to tell us

11 how we're supposed to do it, that's not fair.

12        They can do whatever you they want with it.  They can

13 contest it.  They can argue about it.  Whatever they want.

14 But they shouldn't tell us what to do.

15        In terms of a confidentiality agreement, we're fine

16 with a confidentiality agreement.  We don't -- you know, at

17 trial, you know, the full story will come out.  The press

18 could hear about it then.  That's fine.  But that's not our

19 issue.  Our issue is finding and seeking the truth.  And

20 the way we get the truth is to do testing, unbiased

21 testing.

22        And that's one of the reasons why we want to come

23 back, when the Court finds it appropriate, to do testing of

24 the air quality, so it's not biased, relying upon what

25 Chemours says.  Because we know, based upon their

1   information, you can't, respectfully, always rely upon what

2   they say, because they have not been candid with the

3   government, they haven't been candid with the state, and

4   most importantly, they haven't been candid with the

5   citizens in the communities of North Carolina.

6            THE COURT:  Have you all gotten down the road of

7   actually negotiating the language of a protective order?

8            MR. LEOPOLD:  It's my understanding, and I

9   apologize, I understand a draft protective order was

10  provided to us, and we will immediately look the at it.

11  And I'm sure that -- if it's a standard protective order --

12  and that sort of leads up to the other issues that are teed

13  up for this afternoon -- or for this hearing.

14       We have also a protective order that we have provided

15  in draft form, and I believe counsel for the defendants

16  have reviewed.  And I think they are waiting for the Court

17  to say you need to try and finalize it.  There is that and

18  some other issues we have noticed for today, as well, such

19  as Rule 26 hearing.

20           THE COURT:  Okay.

21           MR. LEOPOLD:  If the Court has any other

22  questions, I'm happy to respond.

23           THE COURT:  No, that's fine.

24       Mr. Reilly, anything else?

25           MR. REILLY:  Very briefly, your Honor.  We have

1    provided -- I just wanted to touch on like two or three

2    things.

3         One is we have provided a draft protective order to

4    the plaintiffs.  It may need a little tweaking in light of

5    the things they've said today.

6              THE COURT:  Right.

7              MR. REILLY:  We'll be happy to provide them with

8    another one within the next five days -- two days, if

9    you -- well, today's Friday --

10             THE COURT:  Right.

11             MR. REILLY:  -- so middle of next week, if

12   that's all right.

13             THE COURT:  Okay.  That's fine.

14             MR. REILLY:  And in terms of -- I don't think I

15   ever stood up here and said that we are retracting our

16   negotiations regarding on-site sampling.  And now,

17   obviously, they've come around to -- based on your Honor's

18   inquiry, they've come around to resolving virtually the

19   bulk of the things that I've raised.

20        But I do need to touch on this -- this notion of --

21   of what kind of testing.  Just so your Honor gets an

22   understanding of what we're talking about here, it has

23   been -- these substances exist in such tiny quantities that

24   it has been extremely difficult to even identify them,

25   period.  Because we're talking about trillionths --

measurements that are in trillionths.

So, there has to have been the creation of testing techniques for how you even test for it.  And Chemours has been very active in collaboration with the DEQ about getting what they call authentic samples for even identifying these substances.

The instrumentation that's used to identify them is called gas chromatography.  And so, they have to have an authentic sample in order to calibrate the machine in order to determine whether or not that's what you're looking at, and then trying to quantify it.

So, Chemours has been very active, and we've provided to plaintiffs' counsel for some of these substances that heretofore had no authentic sampling criteria.  We gave them cutting-edge information, proprietary information, quite frankly, about how you accurately test.  Because if you use a standard test, you won't get accurate information, because you're not actually testing for these substances that exist.

So, in fact, they said what laboratories were going to test for them.  They gave three laboratories:  Gel Labs, which, I think, is in South Carolina; Villanova, which I -- I'm not familiar with Villanova -- it must be at the University of Villanova or Villanova University, but I'm not familiar with it; and the third was Eurofins, which I

believe means Eurofins Lancaster.  Eurofins recently bought

Lancaster.  And Chemours uses Eurofins Lancaster for some

of its testing of these substances.

So, I think we feel very comfortable that Eurofins

will use the most accurate testing technique.

Now, Mr. Leopold is right.  Ted is absolutely correct

that they can use whatever criteria they want.  But what we

were doing -- so your Honor understands, what we were

doing, we're taking split samples.  They get a sample, we

get a sample.  We'll send them off to our respective

commercial laboratories, and they will come back with the

results.  And you would anticipate that if the same sample

is being taken out that same bucket at the same moment, the

results ought to be pretty doggone similar.

And so, what we were saying to them is, hey, look,

use the most accurate technique.  We'll help you.  And now,

if they're going to use Eurofins Lancaster, I believe they

will get the most accurate, most up-to-date technique.

We are familiar with Gel Labs.  I'm not saying

anything disparaging about Gel Labs.  And I don't know

anything about Villanova.  But we've provided this to them

so that they would have, in our minds, the most accurate

testing technique, period.  It wasn't to tell them, oh, you

must do it this way.  But we wanted to know how they were

doing it, so that if they used a different technique and

1    they got a different result, we would be able to understand

2    why that occurred.

3         We weren't telling them you've got to do it this way.

4    I don't -- if we gave you that impression, I apologize,

5    because that was not the intention.  The intention was to

6    try to get everybody -- these are scientists.  This is

7    cutting-edge science.  It's never been done before.  And

8    so, we wanted the most accurate techniques to be employed

9    that's possible.

10        If they don't want to do it -- but I can't imagine

11   that Eurofins won't use it now, because we've trained them

12   how to do it.  They know how to do it.

13        So, anyway, I just wanted to clear that up.

14             THE COURT:  Okay.

15             MR. REILLY:  Thank you, very much, your Honor.

16             THE COURT:  And how about, Mr. Reilly, in terms

17   of the time frame, because I'm going to grant the motion as

18   to the testing -- I mean, as to the samples.  I mean, you

19   all have worked this way.  And I do -- I appreciate how

20   much you all have collaborated, in terms of working through

21   a very complicated matter, to gather, to drill down to,

22   really, what the nub of what you all needed me to decide.

23   And I'll recount some of the standard in a minute for

24   purposes of the record.

25             But, in terms of making the Fayetteville Works

1  facility available in order to gather these water samples,

2  is that something that you all would anticipate being able

3  to do between now and -- because I'd like to have kind of

4  an outside date just so that we keep moving.  And do you

5  have a sense on that?  Or have you all thought through

6  that?

7          MR. REILLY:  If I could have --

8          THE COURT:  Sure.

9      (Counsel conferring.)

10         MR. REILLY:  Okay.  Judge, let me just suggest

11 that we put a month or two months time frame on it.  The

12 only reason I say that is we have things to work out,

13 protective orders that your Honor's going to order be done,

14 things like that.  I can't imagine that 30 days makes a

15 difference here.

16         MR. LEOPOLD:  No, I think a month is

17 appropriate.  I think longer than that is a stretch.

18         THE COURT:  Okay.

19         MR. LEOPOLD:  But I think we certainly -- or

20 close to -- if we could have -- maybe have it, say, on or

21 before --

22         THE COURT:  June 29th?

23         MR. LEOPOLD:  -- maybe right after Fourth of

24 July week, maybe the second week of July.

25         THE COURT:  Okay.  By July 9th?  I mean -- well,

1    I'll put it the end of that week, July 13th.

2            MR. LEOPOLD:  And, of course, if we need a day

3    here or there, that's fine.  And then what I --

4            THE COURT:  And then -- I mean, and then the

5    other, just so that it's clear, and, again, I do appreciate

6    all the work that you've done to get us to this point.  And

7    they're legitimate issues that you all have raised.  And I

8    really do appreciate it.  I appreciate the submissions that

9    you've made, too.  But I'm going to have Chemours -- is it

10   Chemours or Chemours?

11           MR. REILLY:  Chemours.

12           THE COURT:  Chemours -- make the Fayetteville

13   Works facility available to plaintiffs in order to gather

14   water samples from each of the individual wastewater

15   streams at the facility during normal production on three

16   separate dates between now and July 13th, 2018.

17           MR. REILLY:  Yes, your Honor, but just so we're

18   clear, these wastewater streams, you said each of them.

19   There are -- I think what you really mean is -- they

20   combine into a wastewater stream or two wastewater streams,

21   rather than each of them.

22           THE COURT:  Okay.

23           MR. REILLY:  Because that would be monumental.

24           THE COURT:  All right.  So, and would you agree,

25   Mr. Leopold, on that?  You all have gotten --

1          MR. LEOPOLD:  Yes, from five streams that we

2    take.

3          THE COURT:  Right.

4          MR. REILLY:  But they all go -- I understand.

5    But they all go into two streams.  It's all the same thing.

6    It's not like we're --

7          MR. LEOPOLD:  No, no, we -- we need, and we've

8    discussed, five streams independent --

9          MR. REILLY:  Okay.

10          MR. LEOPOLD:  -- so there is no dilution.  And I

11    believe we already have that protocol worked out.

12          THE COURT:  Okay.  From the -- okay, you said

13    that the water is clear.  And, again, I'm going to get

14    something written and out by the end of the day.  But I

15    actually have some criminal sentencings that I've got to do

16    soon.  But I'll get this out by the end of today.

17       So that it's to make the Fayetteville Works facility

18    available to plaintiffs in order to gather water samples

19    from -- from the five --

20          MR. LEOPOLD:  From the five, yes --

21          THE COURT:  -- individual wastewater streams --

22          MR. LEOPOLD:  -- independently, yes.

23          THE COURT:  -- at the facility during normal

24    production on three separate dates between now and July

25    13th, 2018.

 1          The -- I know, in the proposed order that the

 2    plaintiffs submitted, you had language about if certain

 3    manufacturing or wastewater disposal processes are not

 4    operating on those days, then Chemours will permit access

 5    as soon as those processes are again operating.

 6          I gather, in the meet-and-confer, that you all can

 7    get -- you can get three days.  I don't really know if I

 8    need to put that in the order.  Right?  I mean just getting

 9    three days between now and July 13th.  I'll leave that in,

10    but I really expect you all to work that out.

11          And then, fundamentally, on that other issue about

12    restrictions on testing, the plaintiffs are not restricted

13    in the methods they employ to analyze the samples collected

14    or in the chemicals they test for in those samples.

15          Issues associated with that, if you all get way off

16    the scientific highway, then I know we'll deal with it in

17    Daubert motions.  So, you can test for it.

18          But none of this has anything to do, has anything to

19    say about admissibility of whatever evidence you all might

20    gather from your tests.

21          And then, finally, to direct you all to a

22    meet-and-confer and submit a proposed protective order for

23    the Court to enter concerning this expedited discovery.

24    And I'll say submit a proposed protective order not later

25    than June 1st.  That will give you till next Friday.

1          And, again, just for today -- and some of this will

2    be reflected in the order I enter --I obviously recognize

3    that Rule 26(f) -- or the Federal Rules of Civil Procedure

4    generally don't allow parties to engage in discovery prior

5    to a conference under Rule 26(f) except in proceedings

6    exempted from initial disclosures or when authorized by

7    rules, by stipulation or by court order.  Then the rules

8    don't expressly address when expedited discovery can be

9    ordered, and the courts have not settled on a uniform

10   standard.

11         Courts in our circuit, and particularly in this

12   district, look to the reasonableness of the request, taking

13   into account the totality of the circumstances.  Some other

14   courts use more the preliminary injunction standard.  The

15   reasonableness inquiry that we use looks at the procedural

16   posture of the case, whether the discovery issue is

17   narrowly tailored to obtain information that is probative,

18   whether the requesting party would be irreparably harmed by

19   waiting until the parties conduct their Rule 26(f)

20   conference, and whether the documentary information sought

21   through discovery would be unavailable in the future or

22   subject to destruction.

23         As we've talked about here, the plaintiffs seek this

24   access to obtain the test samples of wastewater that are

25   representative of normal production.

1     I recognize, and the Fourth Circuit certainly talked

2  about in *Belcher v. Bassett Furniture Industries,*

3  *Incorporated*, that entering onto someone's premises is a

4  factor the Court is to consider, and I have considered it.

5  Rule 34(a)(2) does allow this type of discovery once there

6  is a Rule 26(f) conference.

7     Here I do think, looking at the totality of the

8  circumstances, that the plaintiffs have shown good cause,

9  that their requests are reasonable and narrowly tailored to

10  obtain critical information about the wastewater that's not

11  accessible elsewhere.

12     I've looked at all the alternatives that you all have

13  proposed, and I don't -- that the defense proposed, and I

14  don't think that there are adequate alternatives.  I don't

15  think their request is overly broad.

16     For purposes of completeness, I again say the

17  preliminary injunction standard does not apply in this

18  district in terms of thinking about this.  Often these

19  issues come up in cases where people are seeking

20  preliminary injunctions, but I think that's why our

21  district is actually more correct.  In terms of how we

22  approach it, it's like even though generally these issues

23  come up in preliminary injunctions, it's -- that doesn't

24  mean that that's the standard that governs or that someone

25  has to meet the standard of a preliminary injunction to get

1   expedited discovery.

2       And I do think, in particular with respect to the

3   arguments of the utilities and issues associated with the

4   ability to incorporate appropriate remediation technology

5   in their redesigns, that this is -- is unique.  So, no one

6   should read this order as somehow expedited discovery is

7   going to be the rule in this district, or, at least, with

8   this Court.  I can't control what other district judges do,

9   but this, I think, is a unique case, as reflected in the

10  record in terms of this request.

11      And so, I do grant the motion, and I'll get a written

12  order out by the end of the day today.

13      Just for purposes of completeness -- I know we have a

14  multitude of dockets, and I know our courtroom deputy will

15  be glad to hear me go through these docket numbers so that

16  we can note for the record that we have resolved the

17  following motions:

18      With respect to the Nix v. Chemours case, docket

19  entry 41, the joint motion for discovery was granted.

20      Docket entry 70, which was the Chemours motion for

21  leave to file second supplemental memorandum regarding the

22  request, I grant that motion.  I've ready everything that

23  was submitted.

24      Docket entry 78, the third motion for leave to file

25  supplemental materials, I grant that motion.  I read all

1    that material.

2          In the Brunswick County v. DowDuPont case, it's

3    docket entry 20, which is the joint motion for discovery,

4    that motion is granted.

5          Docket entry 59 and docket entry 69 are the motions

6    by the defendants to submit supplemental material.  Those

7    are granted.

8          Docket entry 63, which was the joint motion for

9    status conference, I think I've already granted that; but

10   to the extent I haven't, that's granted.  That's why we're

11   all here.

12         Docket entry 20 in the Dew v. DuPont case -- now,

13   there's a separate complaint in that.

14         Mr. Leopold, do you represent the Dew plaintiffs, as

15   well?

16              MR. JOHNSTON:  That would be me, your Honor;

17   Stephen Johnston, Baron & Budd.

18              THE COURT:  Right.

19              MR. LEOPOLD:  And that was one of the issues we

20   were going to raise.  In more of a housekeeping matter,

21   your Honor --

22              THE COURT:  Okay.

23              MR. LEOPOLD:  -- is --

24              THE COURT:  Well, let me run through this -- let

25   me get through this for our courtroom deputy.

1             MR. LEOPOLD:  Okay.

2             THE COURT:  Docket entry 20, the motion for

3 leave to file second supplemental material in the Dew case

4 is granted.  That's the materials the defense submitted.

5       The motion for a status conference, docket entry 24,

6 is granted.  That's why we're here.

7       And then the third motion for leave to submit

8 supplemental material, that motion is granted.

9       So, now let's talk about other housekeeping matters,

10 to include the Dew case.

11            MR. LEOPOLD:  Right.  My understanding, and

12 Baron & Budd's counsel can address it, but there are

13 approximately an additional complaint of homeowners in and

14 around the facility that have contaminated wells that the

15 Baron & Budd firm represent.  I understand that there may

16 be an additional 25 to 30 additional families in and around

17 that area where additional complaints may be filed.

18       And I guess the question is would the Court prefer to

19 have those consolidated into the master complaint and a

20 short form complaint filed, or just separate individual

21 complaints filed and then later consolidated so that the

22 defendants can appropriately respond to those?

23       I'm just not sure how the Court wishes, from a

24 housekeeping matter, because I can see that it can get

25 convoluted.

```
 1              THE COURT:  Right.  How about from the defense
 2    perspective on that?
 3              MR. SHERK:  Your Honor, John Sherk.
 4              THE COURT:  Uh-huh.
 5              MR. SHERK:  We very much prefer that, if new
 6    plaintiffs are added, they're added with an amended
 7    complaint or that the parties are joined according to Rule
 8    15 or Rule 20.
 9         We see a lot of mischief, problems and confusion if
10    we have a willy-nilly, truncated, short-cut procedure to
11    try to add parties.  Now we're down the road.  We're not
12    saying they can't add parties.  We're just saying that we
13    need to follow the rules.
14              THE COURT:  Uh-huh.  Right.  And I think
15    Mr. Leopold recognizes that.  It's just a matter of -- is
16    it something sufficiently different that your clients can't
17    all be in the master complaint of the -- of what I'll call
18    the Nix case?
19         I mean, to me, we have sort of the individual
20    homeowners and the nonutilities.  We have utilities, and
21    then we have the nonutilities.
22              MR. SHERK:  Well, we do view this as different.
23    Nix, of course, is a class group of plaintiffs.  So, these
24    are individuals who are asserting their own property claims
25    that do not desire to be a part of the class.  So, they do
```

1  want to proceed on an individual basis.

2      And what we're trying to do is avoid a constant

3  carousel of new complaints, new motions to dismiss, etc.,

4  trying to do something to unburden the Court as much as

5  possible.

6          THE COURT:  Okay, so you want to keep your folks

7  separate, is what you're saying, is what I hear?

8          MR. SHERK:  Yes, your Honor.  And again, your

9  Honor, we have no problem with them filing another series

10  of complaint or complaints.  We'll figure that out.  We

11  just don't want a new-fangled process that we're not sure

12  how to respond to.

13          THE COURT:  No, no, I totally agree.  I mean, I

14  totally get that.  And we're going to do our very best to

15  follow the rules.

16      So, you've answered my question, and I'm not going to

17  make you join Mr. Leopold's case if you don't want to join

18  it.  But it's just helpful for me to know that we now have

19  the three cases.

20          MR. JOHNSTON:  Does your Honor have a preference

21  on how you want us to amend the current Dew plaintiff's

22  complaint, which is currently subject to a motion to

23  dismiss that's been filed by defendants?  Our response is

24  due next Wednesday on that.

25      Again, your Honor, we're just trying to prevent the

```
 1   Court --
 2                 THE COURT:  Right.
 3                 MR. JOHNSTON:  -- from having to rule on
 4   multiple motions to dismiss.
 5                 THE COURT:  Do you anticipate filing a motion --
 6   I mean an amended complaint for your clients?
 7                 MR. JOHNSTON:  I'm sorry?
 8                 THE COURT:  For your clients?  Is that what you
 9   anticipate?
10                 MR. JOHNSTON:  We do anticipate filing another
11   20 to 25 plaintiffs in the very near future, and we do
12   believe there will be additional plaintiffs on down the
13   road that we'll seek to file.
14                 THE COURT:  But are the -- do you anticipate --
15   but are the core claims going to stay the same in terms
16   of --
17                 MR. JOHNSTON:  Yes.
18                 THE COURT:  Okay.
19                 MR. JOHNSTON:  Essentially just adding new
20   plaintiffs to the existing cause of action.
21                 THE COURT:  Well, it would be most efficient if
22   you all -- if you got them -- for you to amend.  And so,
23   then we can -- and then -- and then, once you do that, just
24   get issues in response.  And I'd expect you all to just
25   meet and, you know, to talk.
```

1          I mean, if the defense told me we think this is

2   somehow different and it's kind of mooted our initial

3   motion to dismiss -- because that's sort of a standard

4   fare.  I mean, in the world post-*Iqbal* and *Twombly*, it's

5   not an uncommon thing, as everyone here knows, where

6   somebody to file a motion to dismiss and then somebody to

7   amend the complaint.  And, at least I know the way I'd do

8   it is, well, this is a new playing field, and so, I'm not

9   going to rule on a motion to dismiss the complaint that's

10  not the operative complaint now.  And I'm going to let

11  everybody be heard who wants to say something about

12  whatever the new complaint is.

13         So, do think you can -- and I'm happy to -- you just

14  need to submit, you know, a consent order or a consent

15  motion of some kind, if you anticipate submitting an

16  amended complaint, you know, to let defense counsel know

17  what you're doing to do.  I don't -- it's tremendously

18  inefficient for you to respond to theirs or for them to

19  reply if everybody knows it's not going to be the operative

20  complaint.

21         So, I would ask you to confer with defense counsel.

22  I think, you know, Mr. Sherk is right that we don't want to

23  not know what we're doing here in terms of the process.

24              MR. JOHNSTON:  We'll meet and confer with

25  defendants, your Honor --

```
 1                THE COURT:  Okay.
 2                MR. JOHNSTON:  -- and figure something out.
 3     Thank you.
 4                THE COURT:  Okay.  Okay.  Are there any other
 5     issues?
 6                MR. LEOPOLD:  Your Honor, the other issue -- no
 7     need to get into the historical issues about whether the
 8     Court wanted us to meet and confer on the Rule 26(f)
 9     meeting and things of that sort.
10                THE COURT:  Right.
11                MR. LEOPOLD:  Just in terms of what the Court
12     would like us to do at this point.  The Court has not ruled
13     on the dispositive motions.
14                THE COURT:  Right.
15                MR. LEOPOLD:  That being said, there's a lot
16     that's going on.
17                THE COURT:  Right.
18                MR. LEOPOLD:  A lot that we'd like to, you know,
19     go on.  We have met in person, and it ended up being,
20     instead of an actual meeting, sort of a get-together with a
21     nice lunch and talk about various issues with the hopes of
22     what we'd want to include.  We've given a draft case
23     management order, if you will.
24          And, from our standpoint, we'd like to get started
25     appropriately, you know, with requests for production and
```

1  things of that sort.  I don't think it's tantamount that

2  the Court have to rule on the motion to dismiss at this

3  point in time.

4          THE COURT:  Right.

5          MR. LEOPOLD:  For us to at least meet and get a

6  case management order to your Honor.  But I think there may

7  be some confusion on both sides as to what the local rule

8  is on the status of that.

9          THE COURT:  Right.

10          MR. LEOPOLD:  So, pending the Court's --

11          THE COURT:  Sure.

12          MR. LEOPOLD:  -- interest on how it would like

13  us to proceed, I guess, leave this limbo, whether we should

14  meet and get the Court case management --

15          THE COURT:  Well, and again -- well, I'll hear

16  from defense counsel.

17          MR. SHERK:  Thank you, your Honor.  We have

18  oodles of respect for Mr. Leopold, but we don't agree here.

19      We think we've filed serious motions to dismiss, your

20  Honor, and there are critical issues that, if the Court

21  decided in our favor, could really narrow the issues --

22          THE COURT:  Right.

23          MR. SHERK:  -- to be considered and end the

24  scope of discovery.  And so, we feel very strongly that we

25  should await the Court's rulings before having a Rule 26

conference.

Let me give you an example.  We have the Cary case.
It's an enormous case; hundreds of thousands of people, I
think, Mr. Leopold said.  It involves claims of personal
injuries, for example that -- honestly, I've been a class
action defense practitioner for a couple decades.  I
thought the sun had set on those kinds of personal-injury-
based class actions.  But we have one here.  And there a
lot of disease end-points that he's raised in that -- in
the context of that case, and he's identified specific
diseases that the class representatives are now suffering
from.

We'd moved to dismiss those components of the case,
saying that the allegations are not specific as to
causation, for example.  And I'm not here to argue the
motions --

THE COURT:  No, I know.

MR. SHERK:  -- I'm just being illustrative.

We said that in the complaint they say that the
diseases, for example, are typical of exposure to GenX.  We
don't think that's enough.  Now, if the Court were to rule
in our favor on that issue, a wide chunk of that case would
go by the wayside and we wouldn't do discovery on that.  We
think that's an important example.

By the same token, in the Cary case, there's a

medical monitoring claim. Now, I've handled medical
monitoring claims for the last 15, 20 years, and they can
be enormous. But we've moved to dismiss that claim, saying
that North Carolina doesn't recognize medical monitoring as
a cause of action or an element of damage. If the Court
rules in our favor on that, by the same token, it will
narrow the issues.

An example from the Dew case, we've got 68
plaintiffs, maybe 20 more to be added. That's a lot. But
we've made the point that only Mr. and Mrs. Dew have
actually specifically alleged an amount of GenX on their
property. As to the rest of the plaintiffs, we don't have
any idea if they have GenX, and, if so, how much.

There's also, in our view, no allegations of specific
damage to property related to GenX. So, we said that's not
good enough in our papers.

If the Court were to rule in our favor with regard to
the Dew case there, we'd go from 68 plaintiffs to two; a
dramatic decrease in the issues to be confronted in the
scope of discovery.

So, that's just a couple of examples, your Honor,
real-world examples of how we think it's important that the
Court decide those issues before we go rushing into a Rule
26 conference.

MR. LEOPOLD: And I certainly can appreciate

that, but I think, on the broader scale, a meet-and-confer
can address all of those issues, where we could have more
global issues that, depending on how the Court rules --
some may be taken away. But there are core issues that --
I think, everybody agrees the case is going to move forward
in some fashion. That we're not waiting I don't know how
many months before amended complaints and 65 other people
come into play, and all these things are teed up. That's
essentially what they're arguing.

        And there's no reason why we can't get together and
try and thread the needle on things we know are
appropriate. Initial requests that, I think, we can agree
on, that -- you know, test results and things they've done
in the past, historical documents, preservation issues.
All of those things that are standard 101 case-management
issues, which, to date, they have, respectfully -- and
they're entitled to do so -- refused to even address.
Refused.

        And, so, I don't see any down side on getting
together, trying to work those things out, and begin the
process. It's going to be slow as it is, but, you know,
computer searches, ESI issues, getting -- you know, finding
out the stake-holders of what documents to get, the groups
and categories of documents that, regardless of who's in
the case in the claims, we know are going to be areas of

1  inquiry and production.  And that's -- that's what I don't

2  see why we have to wait three, six, literally nine months

3  down the road to begin that process.

4         MR. SHERK:  Well, your Honor, if I could make

5  just one point?

6         THE COURT:  Sure.

7         MR. SHERK:  My partner, Mr. Reilly, talked about

8  the ham in the sandwich earlier this morning.  And if

9  there's a motion to dismiss argument out there, I'd call it

10  the big enchilada.  It's the primary jurisdiction argument

11  that we made.

12     If the Court were to look favorably on that component

13  of the motion to dismiss, it would literally stay these

14  cases pending some regulatory activity and decision-making.

15  And so, that is another very important issue that this

16  Court ought to take into account before we surge ahead.

17     I think that, you know, once we get the rulings of

18  the Court, we'll move expeditiously.  We'll be prepared to

19  do so.  And that's the appropriate time to get together and

20  begin.

21         THE COURT:  All right.  Any other issues?

22         MR. LEOPOLD:  No, your Honor, other than, as the

23  Court is, I believe, aware, the issues are teed up.

24         THE COURT:  Right.

25         MR. LEOPOLD:  I mean, everything is briefed,

1  so --

2              THE COURT:  Right.

3              So, I don't know if the Court is going to ask

4  for oral argument or just rule on the papers.  That I don't

5  know the answer to.  How the Court usually handles that,

6  I'm not sure.

7              THE COURT:  It depends.  The safest answer ever

8  since law school; right?  Cold call.  It depends.  I need

9  more facts.

10             MR. LEOPOLD:  Really, what ties into that issue

11  is we have addressed preservation issues.  You know, I have

12  heard all the arguments over the years, and the courts have

13  gone either way.  You know, basically, look, the

14  defendants, you're under an obligation under the rules to

15  preserve, and if you don't, you'd suffer the consequences.

16       We'd just like, other than the confirmation of,

17  quote, we're doing what we are supposed to do, which is

18  what we've heard, which we understand; but there's a lot of

19  history here by way of documents and testing, and things of

20  that sort.  We would just like some affirmative

21  appreciation of preservation -- what's gone on, how it's

22  being done -- because I think that's important.

23       And, thirdly, the last issue, and however the Court

24  wishes, I had raised this at the January hearing, and this

25  hearing status conference is greatly appreciated.  I just

```
1    think, if we were to have -- whether the Court wants us to
2    notice it, but a regular conference maybe every five, six
3    weeks -- maybe in the middle of July -- just to keep the
4    trains running.  I just think it would be very helpful.
5         Today has been very helpful, I know.  I'm sure I
6    speak on behalf of both sides.  It's very helpful for the
7    parties just to keep this -- you know, this moving.  This
8    is, it goes without saying, an important public issue, and
9    we all are getting a lot of inquiries about what is going
10   on.  And it just may be helpful.
11            THE COURT:  All right.  Well, why don't you all,
12   at least on that latter point --
13            MR. REILLY:  Your Honor, if you will allow me to
14   address that?
15            THE COURT:  Sure.
16            MR. REILLY:  This inquiry into -- I've gotten
17   multiple emails asking me to affirm that we are doing what
18   they think we need to do in terms of --
19            THE COURT:  Oh, on that issue, let me just say
20   it is not my habit to order people to follow the law.  And
21   that goes for everyone in this room.  And I know that all
22   of you -- again, it's testified to by all the documents
23   that you all so thoroughly went through in the
24   meet-and-confer, and your professionalism is appreciated
25   and expected.
```

1      And I meant to tell you all at the beginning, in the

2  well of the courtroom here -- I know we're in this small

3  courtroom today because we're having some maintenance done

4  on 1 -- but you're not visitors here, so you never have to

5  wear a visitor's badge in the well of this courtroom.  Now,

6  the CSOs will get after you if you're out in the hallways

7  without one in the federal building, but, in the well of

8  the courtroom, none of the lawyers here are visitors.

9      And so, you don't even have to say what I think you

10  were about to say.  I know you know, and I know the

11  plaintiffs know.  I mean, I know everyone knows their

12  responsibilities.

13      I will look, on the issue of the meet-and-confer --

14  obviously, under the rules, the parties, if they wanted to,

15  you know, reach agreements, even if they're tentative on

16  certain issues.  If you all can do that.  I mean, if you

17  don't want to, you don't have to.  I'm not sure whether

18  I'll have a hearing or hearings on the motions to dismiss.

19  They raise interesting issues.  So, I won't schedule a

20  status conference yet, but as I continue to work on the

21  case, I would expect that to be part of what we do.

22      And, certainly, in this type of case, it's been my

23  practice -- and, again, I have a lot of criminal cases, I

24  can tell you.  I finished a trial a couple days ago and

25  start another one soon -- to, once a case gets into

1  discovery, to try and have the availability, at least, of a

2  magistrate judge, or me, depending on schedules, on a

3  monthly basis just to basically -- or sooner.  And

4  sometimes things can be done by telephone, just because I

5  know the reality of this type of litigation everybody wants

6  to get the answer they want, but a lot of times they just

7  need an answer so they can keep moving.  And we'll

8  certainly do our best to make that happen for you all.

9       Anything else?

10      (Negative replies.)

11      Again, I do want to thank all the lawyers for all

12 their hard work in connection with this.  I will get an

13 order out by the end of the day memorializing what I've

14 decided, and I hope everyone has a wonderful Memorial Day

15 weekend.

16      (Whereupon the proceedings concluded at 12:46 p.m.)

17                  *    *    *

18                **CERTIFICATION**

19      I certify that the foregoing is a correct transcript

20 of the record of proceedings in the above-entitled matter

21 to the best of my skill and ability.

22

23 /s/ Harold M. Hagopian          June 7, 2018
   Contract Court Reporter         Date

24

25