UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | |
|---|---|
| VICTORIA CAREY, MARIE BURRIS, MICHAEL KISER, and BRENT NIX, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> E.I. DUPONT de NEMOURS AND COMPANY and THE CHEMOURS COMPANY FC, LLC, <br><br> Defendants. | Case No.: 7:17-CV-00189-D <br> Case No.: 7:17-CV-00197-D <br> Case No.: 7:17-CV-00201-D |

**PLAINTIFFS' MOTION FOR CORRECTIVE ACTION AND SUPERVISION OF DEFENDANTS' COMMUNICATIONS WITH PUTATIVE CLASS MEMBERS**

Pursuant to Federal Rule of Civil Procedure 23(d), Plaintiffs Victoria Carey, Marie Burris, Michael Kiser, and Brent Nix (collectively, "Plaintiffs") respectfully ask this Court to enter an order supervising Defendant the Chemours Company FC, LLC's ("Chemours") communications with both represented and putative class members in this case. As detailed in the attached supporting memorandum, Chemours has recently sent misleading communications to represented parties and putative class members that risk undermining the legitimacy of the class-litigation process and has refused Plaintiffs' request that it cease all such communications. An order requiring supervision of further communications by Chemours is necessary to prevent any further potential harm or abuse to plaintiffs and putative class members.

# MEMORANDUM IN SUPPORT

## I. INTRODUCTION

On July 16, 2018, Chemours widely disseminated a letter to residential property owners in the vicinity of Chemours' Fayetteville Works Plant. *See* Exh. A (July 16, 2018, Letter from Brian Long, Plant Manager for Fayetteville Works, Chemours, to "Property Owner" and enclosed fact sheet) ("Chemours Letter"). The Chemours Letter, which states that it was distributed to "all . . . homeowners whose drinking water has tested above the provisional state health goal" of 140 parts per trillion ("ppt") for the toxic chemical GenX, purports to offer its recipients a free-of-charge installation of granular activated carbon filtration ("GAC") units on their property as an ostensible solution to eliminate GenX from their well water. The letter states that certain undisclosed "[s]tudies have demonstrated conclusively that the GAC filtration systems remove GenX and similar substances from drinking water," *id.*, but it omits essential details necessary to understand Chemours' representations, includes evasive language, and misleadingly attempts to cloak its "studies" with governmental legitimacy.

Shortly after Chemours sent this letter to affected residents, the North Carolina Department of Environmental Quality ("DEQ") contacted the same residents by letter. *See* Exh. B (August 2, 2018 Letter from Michael Scott, Director of the Division of Waste Management of DEQ) ("DEQ Letter"). The letter represents that "[DEQ] was not consulted by Chemours prior to the distribution of the certified letter to residents," that "the [DEQ] has not approved or directed Chemours to offer GAC systems to residents," and that the "[DEQ]'s position is that a decision on the effectiveness of GAC systems as an effective temporary treatment alternative is premature until we have gathered additional data from the pilot study." *Id*.

The Chemours Letter is both misleading to its recipients and threatens to undermine the legitimacy of the class-litigation process. It makes no mention of the instant litigation and

provides no insight as to whether accepting a GAC unit will affect putative class members' property damage claims. Moreover, Defendants' counsel is unable to confirm that acceptance of a GAC unit does not, in Chemours' view, moot any property damage claims. To preserve putative class members' ability to make informed decisions affecting their own health, determine how and whether to participate in the litigation, and make informed decisions, the Court must invoke its ability to supervise further communications by Chemours to potential class members and order Chemours to take corrective action.

## II. BACKGROUND

Shortly after the news broke in 2017 of Defendants' four-decades-long spate of polluting the Cape Fear River with GenX and other PFAS, Chemours began providing bottled water—at DEQ's request—to homeowners whose wells were contaminated. The provision of bottled water is undoubtedly unsustainable in the long term, but the measure is a necessary intermediate step to ensure at least safe drinking water while permanent remediation—or a similar alternative—falls into place.

In DEQ's view, the best long-term solution is to provide affected well owners with permanent hookups to municipal water supplies, thereby permanently curtailing their need to depend on polluted groundwater for drinking or bathing. Chemours, in contrast, has taken the self-interested view that installing GAC filtration units—which Chemours estimates will cost $10,000 per home—is the more "cost-effective" solution for servicing the approximately 236 homes whose wells have been contaminated.

DEQ and Chemours' disagreement over the viability of GAC filtration as a long-term remediation solution began on January 11, 2018, when Chemours sent to DEQ a letter regarding its proposed "Plan to install Granular Activated Carbon Treatment on Residential Drinking Water Wells." Exh. C, January 11, 2018 Letter from Kevin Garon, Chemours Corporate
5977052v1/015780

Remediation Group, to Michael Scott, Director of DEQ's Division of Waste Management. The letter outlined Chemours' "plans to make unconditional offers to each Affected Well owner to install, operate, and maintain GAC treatment units," *id.* at 1, and attached an implementation plan, a technical memorandum describing certain laboratory tests, and sample letters it proposed to send to affected homeowners.

DEQ immediately responded to Chemours' proposal on January 19, 2018, advising Chemours to wait for approval from the DEQ before offering GAC units to residents, due to lack of adequate data on the effectiveness of the proposed filtration units. Exh. D, Letter from DEQ to Chemours.[1] On May 24, 2018, DEQ yet again communicated to Chemours its belief that GAC filtration units would not provide a permanent and effective solution to remediate the presence of GenX and other PFAS in contaminated wells. *See* Exh. G, May 24, 2018 Letter from Michael Scott, Division of Waste Management, DEQ to Christel Compton, Program Manager, Chemours. Specifically, DEQ stated that

> DEQ does not consider the installation of point of entry filtration units as a long term final solution for the drinking water exceedances except in locations where there is no other safe alternative or where it is preferred by the homeowner.

*Id.* (emphasis added). Instead, DEQ directed Chemours to develop a proposal for furnishing

---

[1] After learning that Chemours had proposed installation of GAC units in affected households to the N.C. DEQ, class counsel requested from Chemours (1) the plan and associated documents; (2) confirmation that Chemours would abide by the DEQ's recommendation that Chemours not install GAC units before receiving DEQ approval; (3) a list of putative class members with whom Chemours communicated, including the date of such communications; and (4) a statement of whether Chemours requested a waiver of liability from any putative class member, including identification of the putative class members who received the request and a copy of any release received. Exh. E, Letter from Steve Morrissey to Stephen D. Feldman, 1-2. Chemours responded that it was permitted to communicate with potential class members, that it would continue to send communications to potential class members, but that its communications did not involve releases or liability waivers. Exh. F, Letter from R. Steven DeGeorge to Steve Morrissey. Chemours did not provide of a list of putative class members with whom it had already communicated or planned to communicate. *Id.*

affected well-water residents "with a permanent public water supply." *Id*.

Several weeks later, DEQ filed in Bladen County Superior Court a Draft Proposed Order that, among other requirements, would require Chemours to "establish permanent replacement water supplies for each household with a water supply well contaminated by any PFAS in exceedance of a health goal established by DHHS or of a health advisory level established by the EPA." Exh. H, Draft Proposed Order for Preliminary Injunctive Relief, *State of N.C. v. The Chemours Company FC, LLC*, No. 17-cvs-580 (Bladen Cty. Sup. Ct.).

Chemours reluctantly followed DEQ's directive, providing a Feasibility Study on June 29, 2018 showing estimated costs and requirements for installing municipal water lines to affected well owners, while maintaining its "view that whole-house granulated activated carbon systems are a highly effective, readily implementable and long-term solution to the underlying concerns here"—*i.e.*, residential well water contaminated with GenX and other toxic PFAS. Exh. I, June 29 Letter from Christel Compton, Program Manager, Chemours, to Michael Scott, Division of Waste Management, DEQ.

Then, not but two weeks later, Chemours issued the "Dear Property Owner" letter and attached fact sheet at issue here. *See* Exh. A. And several of class counsel's clients received the Chemours Letter around the same time—in July and August 2018. *See* Declaration of John Jefferson ¶ 5; Declaration from Marie Burris ¶ 5.

After being notified of the letter, class counsel immediately contacted Defendants' counsel to confirm that the letters were not prepared by Chemours' counsel in violation of North Carolina Rule of Professional Conduct 4.2. *See* Exh. J, August 2, 2018, Letter from Ted Leopold to Ken Reilly). Defendants' counsel responded that the letters were not sent to "persons known by Chemours or its counsel to be represented by [class counsel]." *See* Exh. K, August 8 Letter

from Ken Reilly to Ted Leopold. Class counsel responded that this representation was incorrect because the letter was sent to Marie Burris, who has been listed as a Plaintiff in this action since the Amended Complaint was filed in January. *See* Exh. L, August 9 Letter from Ted Leopold to Ken Reilly. Class counsel also requested that Defendants' counsel confirm that Chemours' position was that acceptance of a GAC unit would not have any legal implications on a putative class member's property damage claims, so that class counsel could properly advise their clients. *See* Exh. J. Defendants' counsel answered that a homeowner did not need "to sign a release or waiver of liability" to accept a GAC unit; class counsel replied that the answer was non-responsive and again asked Defendants' counsel to confirm whether or not Chemours believed that acceptance of a GAC unit would carry any legal consequences for the property-damage claims asserted by the class. *See* Exh. K, L.

DEQ viewed the Chemours Letter as sufficiently misleading and potentially harmful to affected residents that the department took quick action and informed recipients of the Chemours Letter that Chemours' offer was not approved by the DEQ, that the DEQ had not made a decision on whether the GAC units were effective, that the GAC units were a temporary treatment alternative, and that the pilot study on GAC systems was still ongoing. *See* Exh. B.

### III. ARGUMENT

"District courts have broad discretionary powers under [Federal Rule of Civil Procedure] 23(d) to supervise communications with class members." *Riley v. Flowers Baking Co. of Jamestown, LLC*, No. 12-CV-00596, 2015 WL 4249849, at *2 (W.D.N.C. July 13, 2015). That supervisory power begins before a class is certified. *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1226 (S.D. Ala. 2008); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252-53 (S.D.N.Y. 2005) (collecting cases). When a party moves the court to supervise

certain communications to putative class members, it must show: (1) that a communication to putative class members has occurred or is threatened to occur; and (2) that the communication at issue is abusive. *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697 (S.D. Ala. 2003).

Two variants of communications that have been deemed abusive by courts—and therefore warrant intervention under Rule 23(d)—are "communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Id.* (footnote omitted). The Chemours Letter is both. It is misleading in its presentation of scientific information and its attempt to convince property owners to forego receiving free bottled water in the face of government guidance to the contrary. And it undermines cooperation with counsel because it was sent directly to a named plaintiff and other represented parties in this case. Corrective action is therefore not only warranted, but essential.

### A. Misleading Communications Are Abusive

Misleading communications made or sent to putative class members "pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988); *Cox*, 214 F.R.D. at 697 (communications are abusive if they "contain false, misleading or confusing statements"); *Longcrier*, 595 F. Supp. 2d at 1227 ("Federal courts have routinely exercised their discretion to restrict communications in class actions . . . where a party has engaged in misleading . . . behavior with respect to prospective class members."). The types of communications found to have been misleading take a variety of forms, but as relevant here, a misleading communication is one that contains scientific inaccuracies or fails to indicate how a particular transaction might affect a putative class member's rights or remedies in the litigation.

Scientifically inaccurate or incomplete information plainly warrants court intervention. In *In re School Asbestos Litigation*, for instance, a class action by school officials and building owners had been brought against numerous building-product manufacturers seeking, among other things, damages associated with the installation of asbestos in school buildings. *See* 842 F.2d at 673. A non-party trade association acting on the defendants' behalf distributed to various class members a booklet that

> present[ed] the [trade association's] view on the asbestos-in-buildings . . . issue and summarize[d] scientific evidence supporting [its] position. After identifying the [trade association] as "an association of former manufacturers of asbestos-containing products," the booklet goes on to state [the trade association's] view that the presence of asbestos in buildings rarely poses a health hazard, that asbestos removal often is not an appropriate response and may increase risks, that alternatives to removal should be seriously considered, and that expert assistance should be sought by building owners. The . . . booklet d[id] not mention this or any other litigation.

*Id.* at 683. The district court found—and the Court of Appeals agreed—that the booklet was "misleading as to its objectivity and neutrality," that it potentially could "convince members of the plaintiff class to forego asbestos removal," and that the distribution of a "factually or legally incomplete" booklet not only "lack[ed] objectivity and neutrality," but would "result in confusion and adversely affect the administration of justice." *Id.* (citations and quotation marks omitted). Although the appeals court found the district court's remedy too severe—namely, restricting the trade association's communications *not just to class members*, but "rather[] to all public communications about asbestos in school buildings, including speech in legislative and regulatory proceedings," *id.* at 684—it nonetheless agreed that the trade association's communications were sufficiently misleading to warrant corrective action at least as to its "direct communications with plaintiff class members," *id.* at 683.

Similarly, in *Washington v. Lumber Liquidators, Inc.*, a district court granted a pre-

certification class plaintiff early discovery to determine whether certain air-testing kits that a lumber manufacturer had distributed to putative class members were misleading. *See* No. 15-cv-01475, 2015 WL 2089992, at *3 (N.D. Cal. May 5, 2015). In that case, Lumber Liquidators had been sued for selling laminate-wood flooring products containing dangerous levels of formaldehyde, and had sent its customers "home testing kits" that were ostensibly designed to ascertain the amount of formaldehyde present in the products. *Id.* at *1. Arguing that the testing kits were scientifically unproven and were likely to underreport the amount of formaldehyde present in the wood—thereby potentially convincing putative class members to delay or forego remedial measures needed to protect themselves from the dangerous toxin—plaintiffs moved for a preliminary injunction and sought to depose two declarants Defendants offered to support the scientific viability of their home testing kits. *Id.* Finding that Lumber Liquidator's "air testing program could lead to the disruption of the *status quo* . . . by misleading . . . putative class members about the effects of the challenged products or compromising their ability to participate in this litigation," the court ordered Lumber Liquidators to make its employees available for depositions so it could determine "whether a preliminary injunction, corrective notice, or other remedy is appropriate." *Id.*

    In addition to scientifically misleading information, a communication to putative class members may be considered misleading—and therefore abusive—if it fails to indicate how a particular transaction might affect their rights or remedies in the litigation. In *Giles v. St. Charles Health Systems, Inc.*, for example, plaintiffs had sued a hospital system under the Fair Labor Standards Act for unpaid wages associated with time nurses spent studying for and taking tests the hospital required of its nurses. *See* 980 F. Supp. 2d 1223, 1225 (D. Or. 2013). After the lawsuit was filed, the hospital sent its nurses a notice proposing to pay for the unpaid study and

test-taking time if they released all claims against the hospital "in that regard." *Id.* In finding the notice misleading—and in ordering a curative notice—the Court specifically noted that "even if, as defendant contends, the Release does not affect a potential class member's ability to join in this action, it leads caregivers to believe that they have been paid in full and therefore makes it less likely that they will pursue any additional amounts." *Id.* at 1226; *see also Goody v. Jefferson County*, No. 09-cv-437, 2010 WL 3834025, at *3 (D. Idaho Sept. 23, 2010) (requiring corrective notice where defendant's communications with potential class members caused confusion about right to join suit).

In like manner, in *Riley v. Flowers Baking Co.*, a North Carolina district court ordered an employer to distribute curative notices to putative class members informing them about their rights in the class action. 2015 WL 4249849, at *2. In so doing, the court explained that "[a] communication is coercive or misleading when the defendant . . . misinforms [potential class members] by failing to reveal how some proposed transaction might affect their rights in the litigation." *Id.*; *see In re Sch. Asbestos Litig.*, 842 F.2d at 683 ("Communications that seek or threaten to influence the choice of remedies are . . . within a district court's discretion to regulate.").

### B. The Chemours Letter Is Misleading

The Chemours Letter warrants this Court's exercise of its supervisory powers under Federal Rule of Civil Procedure 23(d) because: (1) it constitutes a communication to putative class members; and (2) the communication is misleading. *Cox*, 214 F.R.D. at 697. As described in detail below, the letter materially misleads its recipients by, among other things: insinuating that Chemours' offer is state-sanctioned; portraying the efficacy of GAC filtration units as beyond dispute; failing to detail which substances might be removed by GAC units; failing to advise recipients of any effect that acceptance of the units will have on their rights or remedies in

5977052v1/015780

10
Case 7:17-cv-00201-D Document 76 Filed 08/13/18 Page 10 of 20

this matter; and potentially inducing recipients to place themselves at risk of consuming unsafe water.

*First*, the letter misleadingly suggests that public officials have blessed Chemours' plan to install GAC filtration units as a safe and effective way of guarding against ingestion of GenX.

> **How effective is GAC filtration?**
>
> GAC treatment has been utilized throughout the United States -- and is a proven technology—to treat PFAS compounds. Independent laboratory testing and pilot studies sponsored by Chemours have demonstrated the capability of this technology to reliably and consistently remove GenX and similar compounds to levels below detection when installed and maintained in continuous operation in accordance with Chemours' Implementation Plan. ==Test results and associated report filed with state and local officials show that, as a general matter, the level of removal provides an ample margin of safety below the state provisional health goal.==

Exh. A at 3. By stating that Chemours' test results have been "filed with state and local officials," and that those results "show that" GAC filtration effectively removes GenX contamination, Chemours improperly suggests that government officials have blessed its test results. In fact, however, the DEQ has specifically advised homeowners that it "***was not consulted by Chemours prior to the distribution of [its] letter***," that it "***has not approved or directed Chemours to offer GAC systems to residents***," and that "***a decision on the effectiveness of GAC systems as an effective temporary treatment alternative is premature***." Exh. B at 1 (emphases added). In other words, state officials have explicitly *rejected* Chemours' plan and its test results, and are now being forced to advise homeowners accordingly. In addition, DEQ has made itself abundantly clear in stating that, at best, GAC filtration units, even if proven effective, are only a short-term solution. *See id.* ("DEQ does not consider point-of-entry filtration units like GAC systems as a long-term solution to the GenX and related chemical problems in the Fayetteville area."). The letter, however, plainly implies that Chemours views GAC filtration as a *long-term* solution, since Chemours proposes operating and maintaining the units in perpetuity.

*Second*, Chemours portrays GAC filtration's efficacy as beyond dispute, calling it a "proven technology" and one whose reliability has been verified by an "independent laboratory" whose studies have "demonstrated conclusively that GAC filtration systems remove GenX and similar substances from drinking water."

> - **Studies have demonstrated conclusively that the GAC filtration systems remove GenX and similar substances from drinking water.** Water at test sites, monitored and analyzed by an independent testing laboratory, have shown no detectable GenX or similar compounds after treatment.

> **How effective is GAC filtration?**
> GAC treatment has been utilized throughout the United States -- **and is a proven technology** -- to treat PFAS compounds. **Independent laboratory testing and pilot studies sponsored by Chemours have demonstrated the capability of this technology to reliably and consistently remove GenX and similar compounds to levels below detection** when installed and maintained in continuous operation in accordance with Chemours' Implementation Plan. Test results and associated report filed with state and local officials show that, as a general matter, the level of removal provides an ample margin of safety below the state provisional health goal.

Exh. A at 2, 4. Of course, Chemours provides the letter recipients no means of assessing the veracity of these assertions. Nor does it indicate—as DEQ has made painfully clear—that the jury is still out on whether the type of GAC filtration systems Chemours proposes to install will serve as an effective stop-gap solution until a more permanent remediation plan is in place.

*Third*, Chemours' letter states its view that GAC filtration "remove[s] GenX *and similar substances*," but fails to indicate what those substances are.

> - **Studies have demonstrated conclusively that the GAC filtration systems remove GenX and similar substances from drinking water.** Water at test sites, monitored and analyzed by an independent testing laboratory, have shown no detectable GenX or similar compounds after treatment.

*Id.* at 2. As Plaintiffs explained in their Joint Motion for Limited Expedited Discovery, however, Chemours itself is unable to identify the full range of perfluorinated compounds it has discharged

into the Cape Fear River watershed. By failing to disclose the limits on its understanding of what chemical compounds may be contaminating well-owners' water, Chemours misleadingly suggests that all harmful chemicals will be removed via GAC filtration.

*Fourth*, Chemours tells recipients that its offer comes with "no strings attached."

> - Our offer is unconditional – **no strings attached – no costs, obligations or commitments.** All we need is your permission to install the unit on your property, perform tests to ensure water quality, and have access to the units so we can maintain them.

*Id.* This is facially misleading and inconsistent with the letter itself, which advises that, in fact, acceptance of the GAC unit may result in Chemours' terminating delivery of bottled water.

> Chemours will continue to provide delivery of bottled drinking water, free of charge, **until we install and verify the effective operation of your system.**

*Id.* In addition, the "no strings attached" statement is misleading for a far more important reason, which is that Chemours has simply refused to disclose whether, in its view, acceptance of a GAC filtration unit will have any effect on putative class members rights or remedies in this litigation. This is so despite class counsel's repeated requests to Chemours to clarify its position on the matter, which Chemours has ignored.[2] As the Court stated in *Riley*, a communication is necessarily "misleading when the defendant . . . misinforms [potential class members] by failing to reveal how some proposed transaction might affect their rights in the litigation." 2015 WL 4249849, at *2.

---

[2] In class counsel's August 9 response to Defendants' counsel, Exh. L, class counsel again requested confirmation that Chemours' position was that acceptance of a GAC unit would have no effect on putative class members' claims. Class counsel asked for a response by August 14, 2018. Plaintiffs are filing this motion on August 13, 2018 because they received the DEQ Letter, Exh. B, on August 10, 2018—one day after sending the previous letter to Defendants' counsel. Because of the urgent need for corrective action—namely, the misleading information in the Chemours Letter that may affect the health of multiple residents—Plaintiffs opted to file this emergency motion as soon as possible before waiting for response from Defendants' counsel.

*Fifth*, the letter states that accepting the filtration unit may result in Chemours' ceasing to deliver free bottled drinking water to residents, despite the potential risk of harm of doing so.

> **How will I know the system is working or when it needs to be serviced?**
>
> Along with the treatment system, Chemours is also offering to collect verification samples on a regular routine basis for independent laboratory analysis to confirm GenX removal and to determine the required timing of GAC cartridge replacement needed to maintain acceptable performance. Based on the results of our recent pilot studies we anticipate the frequency of verification sampling to be either bi-monthly or quarterly. These results will be reported to residents as it is received to give you confidence that your system is performing as expected. ==We will continue to provide you delivery of bottled drinking water free of charge until we have installed and verified system performance.== Until we can implement whole-house treatment at your residence, please continue to refer to the Fact Sheet prepared by DHHS, which contains information about GenX and their guidelines for safe use of your water for non-drinking purposes.

Exh. A at 4. Specifically, Chemours is plainly willing to advise residents that they may safely forego reliance on bottled water, notwithstanding DEQ's clear and sharp objection that the test data is, at present, insufficiently reliable to allow residents to safely use filtered water in lieu of bottled water. *See* Exh. B at 1.

In sum, the Chemours Letter is misleading in its scientific misrepresentations and material omissions, its improper (and false) attempt to trade on government *bona fides*, and its failure to advise residents on the potential health and legal consequences of accepting the offer.

      C.      <u>Chemours' Direct Contact with Represented Parties Is Also Abusive</u>

Separate and apart from misleading communications, "communications that undermine cooperation with or confidence in class counsel" are "abusive" and therefore warrant a court's exercise of its supervisory authority under Rule 23(d). *Cox*, 214 F.R.D. at 697. That is precisely what happened here when Chemours sent its misleading letter directly to parties represented by class counsel, including a named plaintiff in this suit. *See Loatman v. Summit Bank*, 174 F.R.D. 592, 601-02 (D.N.J. 1997) ("By intentionally avoiding plaintiff's class counsel and contacting [the named plaintiff] personally after plaintiff's counsel had provided instructions to the

contrary, defendant could have caused the relationship between plaintiff and her attorneys to become tense and distrustful.").

Class counsel was first notified on July 19, 2018 that client John Jefferson had received the Chemours Letter. *See* Jefferson Decl. ¶ 8. Jefferson contacted class counsel because he was concerned that accepting the offer would eliminate his claims against Chemours. *Id*. at ¶¶ 8–9. Counsel immediately contacted Defendants' counsel to let them know that the Chemours Letter was sent to a represented party. *See* Exh. J. Defendants' counsel responded that the letter was not sent to any parties known to be represented by class counsel. *See* Exh. K. Class counsel responded that this was incorrect, as counsel had just learned that the Chemours Letter had also been sent to and received by Marie Burris, who has been named as a plaintiff in this litigation since January 2018. *See* Exh. L; Burris Decl. ¶¶ 1, 4, 5.

"Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent . . . on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misrepresentations could well be irreparable." *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1203 (11th Cir. 1985). For that reason, courts have consistently held that direct communications with represented class members—particularly those that may sow discord between plaintiffs and their counsel—are potentially abusive communications warranting correction and/or supervision under Rule 23(d). *Id.*; *see Gortat v. Capala Bros.*, No. 07-cv-3629, 2010 WL 1879922, at *5 (E.D.N.Y. May 10, 2010); *cf. Loatman*, 174 F.R.D. at 602 ("The obvious dangers relating to unsupervised communications with potential class members are magnified when the contact is directed personally to the named class representative, as in this case.").

For similar reasons, North Carolina Rule of Professional Conduct ("N.C. R.P.C.") 4.2

prohibits a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter. N.C. R.P.C. 4.2(a). Defendants' counsel has suggested it does not believe that the Chemours Letter was sent in violation of N.C. R.P.C. 4.2 because it was not sent to any parties known to be represented by class counsel. *See* Exh. K. But because Chemours disseminated its Letter so haphazardly—addressing it blindly to all "property owners"—it ended up in the hands of numerous represented parties, including one who has been named as a plaintiff in the instant litigation for seven months. Moreover, in the same correspondence, Defendants' counsel refused to confirm that acceptance of Chemours' offer would have no effect on Plaintiffs' and putative class members' property claims. *See* Exhs. J, K, L. In so doing, Defendants have implicitly recognized that the Chemours Letter may eliminate the represented parties' claims—and they sent this letter to represented parties *without notifying class counsel*. Defendants' actions are in direct conflict with the purpose of N.C. R.P.C. 4.2, which is to protect represented parties and prevent against possible overreaching by other lawyers and interference by lawyers with the client-lawyer relationship. *See* N.C. R.P.C. 4.2 cmt. 1.[3]

D. <u>Court Supervision Is Warranted to Prevent Abusive Communications</u>

Because Chemours has shown no compunction about spreading false and misleading information to putative class members, and because Chemours continues to contact named plaintiffs and class members who have retained the undersigned counsel in this litigation, Plaintiffs request that the Court exercise its discretion to provide narrowly tailored and appropriately limited oversight over Defendants' communications to putative class members and

---

[3] That the letter was sent by Chemours instead of by Defendants' counsel is of no moment, as "an attorney may not do through a third person what he may not do himself." *Larry James Oldsmobile-Pontiac-GMC Truck Co. v. Gen. Motors Corp.*, 175 F.R.D. 234, 245 (N.D. Miss. 1997).

represented parties. In particular, Plaintiffs respectfully ask the Court to enter an order:

1) directing Chemours to submit a curative notice to putative class members making clear that the instant class action is pending against Chemours, that affected residents may contact class counsel for information about their claims, that acceptance of the GAC filtration unit will have no effect on any putative class member's rights or remedies in this litigation, and that DEQ has specifically advised residents not to accept the units, *see Riley*, 2015 WL 4249849, at *2; *Goody*, 2010 WL 3834025, at *3; *Zamboni v. Pepe W. 48th St. LLC*, No. 12-cv-3157, 2013 WL 978935, at *3-4 (S.D.N.Y. Mar. 12, 2013) ("The appropriate remedy . . . is to require notice alerting employees that they have not waived any . . . rights . . . .");

2) directing Chemours to route all communications to represented plaintiffs through the undersigned counsel of record;

3) directing Chemours to copy class counsel on all proposed communications to putative class members going forward and provide class counsel with names and contact information for any person so contacted; and

4) providing class counsel 10 days in which to petition the court to order Chemours to cure any future misleading statement or other deficiency in any communication going forward. *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 564 (S.D. Fla. 2008).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court exercise its discretion under Rule 23(d) to supervise class communications. A copy of a proposed order is attached hereto.

Dated: August 13, 2018

Respectfully submitted,

*/s/Theodore J. Leopold*
Theodore J. Leopold
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
2925 PGA Boulevard, Suite 220
Palm Beach Gardens, FL 33410
(561) 515-1400 Telephone
(561) 515-1401 Facsimile
tleopold@cohenmilstein.com

*/s/Jay Chaudhuri*
Jay Chaudhuri
N.C. Bar No. 27747

**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
150 Fayetteville Street
Suite 980
Raleigh, NC 27601
(919) 890-0560 Telephone
(919) 890-0567 Facsimile
jchaudhuri@cohenmilstein.com

*/s/Andrew Whiteman*
Andrew Whiteman
N.C. Bar No. 9523
**WHITEMAN LAW FIRM**
5400 Glenwood Ave., Suite 225
Raleigh, NC 27612
(919) 571-8300 Telephone
(919) 571-1004 Facsimile
aow@whiteman-law.com

S. Douglas Bunch
Douglas J. McNamara
Jamie Bowers
Alison Deich
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
1100 New York Ave., N.W.,
Suite 500
Washington, D.C. 20005
(202) 408-4600 Telephone
(202) 408-4699 Facsimile
dbunch@cohenmilstein.com
dmcnamara@cohenmilstein.com
jbowers@cohenmilstein.com
adeich@cohenmilstein.com

Vineet Bhatia
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-3666 Telephone
(713) 654-6666 Facsimile
vbhatia@susmangodfrey.com

*/s/Steven Seigel*
Stephen Morrissey
Jordan Connors

Steven Seigel
**SUSMAN GODFREY, L.L.P.**
1201 Third Ave.
Suite 3800
Seattle, WA 98101
(206) 516-3880 Telephone
(206) 516-3883 Facsimile
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com
sseigel@susmangodfrey.com

Gary W. Jackson
N.C. Bar No. 13976
**THE LAW OFFICES OF
JAMES SCOTT FARRIN, P.C.**
280 South Mangum Street
Suite 400
Durham, NC 27701
(919)-688-4991 Telephone
(800)-716-7881 Facsimile
gjackson@farrin.com

Neal H. Weinfield
**THE DEDENDUM GROUP**
1956 Cloverdale Ave.
Highland Park, IL 60035
(312) 613-0800 Telephone
(847) 478-0800 Facsimile
nhw@dedendumgroup.com

*Attorney for Plaintiffs Carey, Burris, Kiser, and Nix*

# CERTIFICATE OF SERVICE

I hereby certify that the undersigned electronically filed the foregoing document with the Clerk of the Court using the ECF system, with notices of case activity to be generated and sent electronically to counsel of record who are registered to receive such service.

<table>
<tr><td>

August 13, 2018<br>
Date

</td><td>

/s/ Steven M. Seigel<br>
Steven Seigel<br>
SUSMAN GODFREY, L.L.P.<br>
1201 Third Ave.<br>
Suite 3800<br>
Seattle, WA 98101<br>
(206) 516-3880 Telephone<br>
(206) 516-3883 Facsimile<br>
sseigel@susmangodfrey.com

</td></tr>
</table>